**ORTHO DIAGNOSTIC SYSTEMS, INC., Plaintiff,**

v.

**ABBOTT LABORATORIES, INC., Defendant.**

**No. 93 Civ. 2656 (LBS).**

United States District Court, S.D. New York.

May 28, 1993.

445 F.2d 792 (2d Cir.), *cert. denied* 404 U.S. 967, 92 S.Ct. 346, 30 L.Ed.2d 287 (1971).

**10.** Compare *Roberts v. Lyons,* 131 F.R.D. 75 (E.D.Pa.1990).

146

Kramer, Levin, Naftalis, Nessen, Kamin & Frankel, New York City, for plaintiff; Robert M. Heller, Harold P. Weinberger, Michael S. Oberman, Alexander M. Vasilescu, Richard K. Milin, of counsel.

Munger, Tolles & Olson, Los Angeles, CA, for defendant; Jeffrey I. Weinberger, Steven

M. Perry, Glenn D. Pomerantz, Henry Weissman, of counsel.

## OPINION

SAND, District Judge.

By Order dated May 26, 1993, this Court denied a preliminary injunction and briefly deferred the filing of this Opinion to enable the parties to examine the Opinion for the sole purpose of advising the Court if any material contained herein is regarded as being confidential. In this Opinion we have set forth our reasons for the denial of preliminary injunctive relief.

This case is before the Court on a motion by plaintiff, Ortho Diagnostic Systems, Inc. ("Ortho") for a preliminary injunction, seeking to enjoin implementation of a contract entered into between defendant Abbott Laboratories, Inc. ("Abbott") and the Council of Community Blood Centers ("CCBC") on the ground that the contract violates various provisions of the antitrust laws. Because we find that plaintiff has not demonstrated a likelihood that it will suffer irreparable harm if the contract is not enjoined, we must deny the preliminary injunction. However, in recognition of the significant interests at stake, both private and public, we have set a date for trial on the merits of November 15, 1993.

### Procedural Background

Plaintiff filed its complaint on April 22, 1993. On April 23, 1993, this Court signed an order to show cause in which plaintiff requested expedited discovery and a hearing on the preliminary injunction. The Court heard argument on the order to show cause on April 27, 1993, and granted the motion, providing for certain limited expedited discovery. At that argument, the Court scheduled a hearing on the preliminary injunction for May 20 and 21, 1993. On April 30, 1993, the Court heard argument on a motion by

defendant to transfer the case to the Northern District of Illinois. That motion was denied. On May 21, 1993 the Court heard oral argument regarding the issuance of a preliminary injunction. We have taken all care to resolve the issue before the effective date of the contract, which is June 1, 1993, and our decision follows.

### Factual Background

■ Findings of fact and conclusions of law made by the Court at the preliminary injunction stage of a case are not binding at trial on the merits. *University of Texas v. Camenisch*, 451 U.S. 390, 395, 101 S.Ct. 1830, 1834, 68 L.Ed.2d 175 (1981). The following facts are those which we find have been demonstrated by the submissions of the parties and during the hearing for the purpose of determining the propriety of a preliminary injunction only.

Plaintiff Ortho is a New Jersey corporation having its principal place of business in New Jersey and is a wholly owned subsidiary of Johnson & Johnson. Defendant Abbott is an Illinois corporation having its principal place of business in Illinois and licensed to do business in New York.

Both Ortho and Abbott sell blood screening tests used by blood donor centers ("BDCs") and plasma centers[1] to ensure the purity of blood collected across the country.[2] There are five tests which are used by BDCs to screen each unit of blood donated for transfusion: (1) HBsAg tests for hepatitis B surface antigens; (2) HIV 1/2 tests for two strains of the HIV AIDS virus; (3) Anti-core is a further test for hepatitis B; (4) HTLV tests for a form of leukemia; and (5) HCV tests for hepatitis C. These tests are not interchangeable; each must be performed on every unit of blood collected. Plasma centers usually provide blood components, rather than whole blood, to hospitals and indus-

---

1. Ortho is also involved in the "diagnostic" market, which is composed of hospitals, commercial laboratories and other facilities which test blood to diagnose disease. The diagnostic market is not implicated in this lawsuit, but Ortho's role in that market is a factor which increases the improbability of Ortho exiting the blood-screening market as a result of the CCBC contract.

2. Both companies also compete in the international market, but there is no dispute that the relevant geographic market for purposes of this lawsuit is the United States. We note the participation in the international market because it casts doubt on Ortho's claim that it will greatly reduce its expenditures for research and development if the contract at issue here takes effect.

try. Plasma centers use three of these five tests, specifically the HCV, HBsAg, and HIV 1/2 tests. Abbott and Ortho use different technologies to perform the test which are incompatible with each other; Abbott uses a "bead" technology, and Ortho uses a "micro-plate" technology.

In addition to the tests, many BDCs use a computer software data management system to record and correlate the results of the thousands of individual units of blood tested daily. Abbott's proprietary data management system, upon which many BDCs depend, is known as "DMS". The American Red Cross ("ARC") owns the DMS system outright. Other BDCs which use DMS must obtain it from Abbott. Some large BDCs have developed their own data management systems, and therefore do not use DMS at all. Abbott estimates that 23.7 percent of the screening tests performed each year by BDCs and plasma centers are processed by Abbott-owned DMS systems. (Bryant Decl. at ¶ 17). Ortho is in the process of developing a comparable computer software system, "LOMS", which is currently undergoing field testing.

Four companies sell the blood screening tests in the United States. Only Abbott sells all five of the blood screening tests. Ortho sells HCV, HBsAg and Anti-core. Ortho also offers an HTLV test, but it has not gained acceptance in the market. Ortho currently has applications pending for FDA approval of both an improved HTLV test, and an HIV 1/2 test. Ortho's internal estimates indicate that the HTLV test could gain approval by as early as June of this year (Michels Dep. at 35) and the HIV 1/2 test could gain approval by the second half of 1993 (Michels Dep. at 33). Abbott's and Ortho's only other competitors have a negligible share of the market and therefore do not play a part in this lawsuit.

BDCs and plasma centers together collect approximately 25 million units of blood annually. BDCs collect blood from volunteer donors and screen approximately 13 million units of blood annually. The BDC customer group includes the American Red Cross, which tests approximately 50 percent of these 13 million units; the CCBC, an associa-

tion of approximately 55 BDCs which together accounts for approximately 35 to 40 percent, or approximately 5 million units, of the blood collected and tested; and unaffiliated BDCs which account for the balance of the blood collected.

Abbott and Ortho differ on whether the relevant customer market is the BDCs alone or the BDCs and the plasma centers taken together. However, it is clear that Abbott holds a predominant share of the market, defined either way, in four out of five of the tests. For example, Abbott's unit and dollar market shares of sales to BDCs in 1992 were approximately as follows:

| Product | Units | Dollars |
|---------|-------|---------|
| HTLV | 91% | 90% |
| HIV | 86% | 87% |
| HBsAg | 75% | 73% |
| Anti-core | 70% | 69% |
| HCV | 21% | 20% |

This market power is reinforced by high barriers to entry into the market for blood screening tests, including the high costs of research and development, and the expense of acquiring patents, maintaining a large sales and technical support staff and obtaining FDA approvals.

*The Contract*

At the core of this action is a contract which Abbott signed in April, 1993 with the CCBC. This group purchasing agreement is intended to govern the prices of Abbott's blood screening assays for the next three years, and goes into effect on June 1, 1993. The individual BDCs have the choice of whether to sign on to the master contract, or to negotiate individual deals. According to Abbott's U.S. Marketing Manager, not all of the CCBC's members participate in group purchasing agreements. Only about 30 out of the 55 or so CCBC members, or about 60 percent, participated in the prior group agreement with Abbott which expires on May 31, 1993 (Bryant Decl. at ¶ 4). The CCBC collects a 1.5 percent commission on all sales under its master agreements, the proceeds of which it uses to run programs and provide services for its members.

In the fall of 1992, the CCBC formed a negotiating team for the purpose of negotiating a new long-term group purchasing agreement. The CCBC negotiators met separately with both Abbott and Ortho in the fall of 1992, and then submitted a "request for proposal" ("RFP") to both companies. The RFP asked both companies to submit bids that included prices for various combinations of the tests, including a five-assay package, as well as prices for each test individually. The RFP also requested prices which included data management software, and prices for the software separately.

Although the Court was presented with a great deal of deposition testimony on the bidding process, it is sufficient to note that both companies competed for the CCBC contract, providing pricing for all five tests and software and for various other combinations.[3] After lengthy negotiations and submission of supplemental proposals, the negotiating team forwarded its recommendation of the Abbott proposal to the CCBC Group Purchasing Subcommittee, which ultimately decided to recommend the proposal to the CCBC members.

Ortho alleges that Abbott's contract with the CCBC is designed to foreclose Ortho from competing with Abbott for the next three years. Abbott has accomplished this, Ortho alleges, by devising a pricing scheme which would in effect force any rational buyer to purchase all five tests from Abbott, even though the buyer might rather purchase one or more tests from Ortho or one of the other competing companies.

The pricing structure which would go into effect according to the CCBC contract is as follows:

CCBC members who agree to purchase all five tests exclusively from Abbott pay the following:

| Test | Price |
|------|-------|
| HBsAg | 0.66 |
| Anti-core | 0.85 |
| HTLV | 1.03 |
| HIV–1/2 | 1.93 |
| HCV | 2.90 |
| Total | 7.37 |

Also included in this package is the DMS system.

CCBC members who agree to purchase four tests from Abbott must pay:

| Test | Price w/DMS | Price w/o DMS |
|------|-------------|---------------|
| HBsAg | 0.81 | 0.72 |
| Anti-core | 1.14 | 1.05 |
| HTLV | 1.18 | 1.09 |
| HIV–1/2 | 2.08 | 1.99 |
| HCV | 2.90 | 2.90 |
| Total | 8.11 | 7.75 |

CCBC members who agree to buy three or less tests from Abbott pay according to the following schedule, and DMS is not included with purchase of three or fewer assays:

| Test | Price |
|------|-------|
| HBsAg | 1.20 |
| Anti-core | 1.25 |
| HTLV | 1.57 |
| HIV–1/2 | 2.47 |
| HCV | 3.53 |
| Total | 10.02 |

Plaintiff provides a number of examples of how the pricing structure allegedly will exclude Ortho from selling to CCBC members. Plaintiff alleges that Abbott has exploited the fact that the great majority of purchasers buy the Abbott HTLV and HIV–1/2 tests, and has used price penalties to force purchasers to buy the other three tests from Abbott as well. A few of the examples are set out in the footnote.[4]

3. In its five-assay package, Ortho offered its own HTLV test, which is not generally accepted on the market, and an HIV 1/2 test manufactured by Genetic Systems (one of the two smaller competitors). Ortho also offered its LOMS computer software system, although Ortho alleges that the CCBC understood that the system was not yet ready to be implemented.

4. If a customer wishes to buy Abbott's HTLV and HIV–1/2 together with its HCV, the price for the three would cost 7.57, while its price for all five

of the tests would be 7.37, including the DMS system which is not available with the three assay package. Therefore, in order to sell the remaining two tests at a competitive price, Ortho alleges it would have to give the two tests away, plus give the customer a .20 cent rebate and a free data management software system, which it does not have at this time.

While perhaps not as dramatic as that example, other combinations of tests produce similar pricing effects. For example, if a customer were

In addition to this pricing structure, the CCBC contract contains what plaintiff has referred to as a "bridge" clause. This clause provides that if a competing company develops a new test, a customer may switch over from Abbott only until that time when Abbott develops a comparable test approved by the FDA. This provision was included as a response to the BDCs' concerns that if a new or improved test were to be developed in the micro-plate technology, the centers might be locked in to the Abbott contract and not be able to use the new test, or might be charged a prohibitive price by the company offering the new test. The provision allows a BDC to switch to the other technology with Abbott picking up the cost of the switch and any increased cost of the new test, as long as the customer agrees to switch back when Abbott has developed a comparable new or improved test in the bead technology. Ortho alleges that this provision improperly limits Abbott's competitors to short-term profits from technological gains and would therefore have an adverse effect on research and development.

The third feature of the master contract with which Ortho takes issue is the alleged tie-in of the DMS system to the tests. Ortho argues, in essence, that by refusing to quote a price on DMS for BDCs who wish to purchase less than four assays from Abbott, Abbott has effectively made it impossible for many BDCs to purchase tests from Ortho because the BDCs are dependent on the DMS system. In response, Abbott argues that it will negotiate individual deals with BDCs who enter contracts for three assays or less with a high enough volume to warrant inclusion of DMS in the deal.

Finally, Ortho has alleged that Abbott intends to enter into a contract with the American Red Cross during the next few months, which will impose similar arrangements on another 50 percent of the BDC market. If this happens, Ortho alleges, Abbott will have effectively forced Ortho out of the market for blood screening tests entirely. Abbott argues that there is no evidence that Abbott will be able to enter into a similar contract

with the ARC when that contract expires at the end of this year. First of all, Abbott argues that by that time, Ortho will likely have FDA approval of the HIV and enhanced HTLV tests, and will therefore be in a better position to offer a more competitive five-assay deal to the ARC. Secondly, Abbott argues that any alleged leveraging of the DMS system cannot be part of a deal with the ARC, since the ARC already owns the DMS system.

### Discussion

A preliminary injunction is appropriate on " 'a showing of (a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly towards the party requesting the preliminary relief.' " *Savage v. Gorski*, 850 F.2d 64, 67 (2d Cir.1988) (*quoting Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.*, 596 F.2d 70, 72 (2d Cir.1979)).

### A. Irreparable Injury:

■ In this Circuit, an applicant for a preliminary injunction must show that "it is likely to suffer irreparable harm if equitable relief is denied." *JSG Trading Corp. v. Tray–Wrap, Inc.*, 917 F.2d 75, 79 (2d Cir. 1990). The Second Circuit has consistently held that "perhaps the single most important prerequisite for the issuance of a preliminary injunction is a demonstration that if it is not granted the applicant is likely to suffer irreparable harm before a decision on the merits can be rendered." *Bell & Howell: Mamiya Co. v. Masel Supply Co.*, 719 F.2d 42, 45 (2d Cir.1983). An antitrust plaintiff must make the same showing of irreparable harm as any other plaintiff. *See Jack Kahn Music Co. v. Baldwin Piano & Organ*, 604 F.2d 755, 759 (Clayton Act "requires 'a showing that the danger of irreparable loss or damage is immediate.' ").

■ We find that plaintiff has not satisfied its burden of demonstrating that it is likely to suffer irreparable injury if this Court does

to buy all the tests except the HBsAg test from Abbott, the price for the Abbott tests would be $7.30. Therefore, to meet the price of the Abbott

five-test package, $7.37, Ortho alleges it would have to offer the HBsAg test for 0.7 cents.

not enjoin the CCBC contract. We have reached this conclusion based on a number of factors, which we will discuss in turn.

Abbott argues that even if plaintiff proves its antitrust claims, its only damages will be the loss of customers, an injury which can be fully compensated by monetary relief. It is well settled in this Circuit that "irreparable injury means injury for which a monetary award cannot be adequate compensation, and that where money damages is adequate compensation a preliminary injunction will not issue." *Jackson Dairy, Inc. v. H.P. Hood & Sons,* 596 F.2d 70, 72 (2d Cir.1979).

We agree with Abbott's characterization. Assuming Ortho can prove liability, it appears to this Court that Ortho's losses, if any, can be compensated by money damages. Plaintiff will be able to demonstrate which customers switched from Ortho to Abbott, and the amount of revenues foregone from that loss of business. Ortho argues that it will not be able to prove lost opportunity; i.e. those customers which it might have been able to sign had Abbott's illegal pricing scheme not been in effect. However, while such damages may be difficult to prove, that difficulty is not insurmountable. Furthermore, the availability of treble damages under the antitrust laws might well counteract this perceived problem.

Abbott further argues that because Ortho is a very successful corporation, which sells many other products aside from the blood-screening tests, and moreover is a subsidiary of Johnson & Johnson, it can sustain any loss of business which might occur. Abbott thereby distinguishes the cases cited by Ortho in its papers, which involve the destruction of "mom and pop" businesses. *Roso–Lino Beverage Dist., Inc. v. Coca–Cola Bottling Co.,* 749 F.2d 124, 125–26 (2d Cir.1984); *Semmes Motors, Inc. v. Ford Motor Co.,* 429 F.2d 1197, 1205 (2d Cir.1970).

Again, we find Abbott's position persuasive. Ortho has not presented credible evidence that it will be forced out of the U.S. blood screening business if the CCBC contract is not enjoined. This is a highly volatile market, and too many variables are in flux to make it likely that Ortho would suddenly drop out of the running. We believe that much of Ortho's argument was premised on the misconception that it could be many years before a trial on the merits.[5] However, we have set a date of November 15, 1993 for trial, and therefore the relevant question is whether plaintiff will suffer irreparable injury between today and November 15, 1993, six months from now.

Most importantly in this regard, a large portion of Ortho's existing business with CCBC is secured by long-term contracts which do not expire until July, 1994 at the earliest (Michels Dep., Exh. 13). These sales will continue regardless of the new master agreement, and well beyond the date set for trial on the merits. The continuation of this business makes it quite unlikely that Ortho will drastically cut its sales staff, research and development, or support services in the coming months. As noted above, Ortho's participation in the diagnostic market, which uses some of these same blood-screening tests as well as others which Ortho manufactures, also leads us to the conclusion that Ortho will not disappear from this market overnight.

Additionally, in order to prevail on the irreparable injury prong of the test, Ortho would have had to convince the Court that the difficulty and costs of switching between the two technologies was so burdensome, that once the BDCs switched to the Abbott technology on June 1, 1993 they would be lost to Ortho. Plaintiff however failed to provide any estimate of the time or cost involved in switching between the two technologies. Although some deponents testified that switching would be disruptive, Mr. MacPherson, the Executive Director of the CCBC, testified that many centers told him that "they didn't see it as a big deal to go to

---

5. See transcript, proceedings, May 21, 1993 at 49 where plaintiff's counsel argued on the basis of a three year interval before trial on the merits could be held. Plaintiff's counsel later agreed that if an injunction were denied plaintiff could be ready for trial on the merits in October. Transcript at 67. Defendant's counsel asserted that one year would be required to complete pretrial discovery. We believe that no good reason exists why this case could not be ready for trial on the merits by November 15, 1993. Transcript at 66.

make two technology switches if you were going back to a system that you were already comfortable with." (MacPherson Dep. at 120) Therefore, the mere fact that some centers will have switched to the bead technology as of June 1, 1993 does not mean that Ortho necessarily will lose the customer base if the preliminary injunction does not issue.

Various other factors also make it unlikely that Ortho will suffer irreparable harm during this time frame. Ortho's allegation that Abbott will sign a similar master agreement with the ARC in the near future, closing Ortho out of 50 percent of the BDC market, is not supported by the evidence thus far. The ARC contract does not expire until the end of 1993; again, this is after the date set for trial on the merits. Furthermore, by the end of 1993, Ortho may very well have FDA approval for the HIV and enhanced HTLV tests, placing Ortho in a different position to compete with Abbott by its ability to offer a five-assay package. As noted above, the "leverage" which Abbott allegedly enjoys by virtue of DMS has no impact on the ARC, which already owns the program.

Ortho's proximity to developing a comparable data management system, LOMS, is another factor which weighs against a finding of irreparable injury. If Ortho is successful in this regard, it will be able to compete for much of the business which Abbott allegedly controls because of the BDCs' dependence on DMS. It is implausible that Ortho would cease its efforts in this market when it is possibly so close to achieving true competitive status.

For all the foregoing reasons, we find that plaintiff has not met its burden of demonstrating that it is likely to suffer irreparable harm if this Court does not enjoin the CCBC contract. Ortho's reliance on the Seventh Circuit's decision in *General Leaseways, Inc. v. National Truck Leasing Ass'n*, 744 F.2d 588, 591 (7th Cir.1984) is misplaced. That circuit does not require a showing of irreparable harm, but instead engages in an analysis of the relative harms that each side would suffer from the grant or denial of an injunction. It is by no means clear that Ortho would prevail even upon that analysis, but in any event, it is inapplicable.

Because Ortho has not met the threshold burden of proving irreparable injury, the first prong of the test for a preliminary injunction, we do not need to address the second prong of the test, namely whether Ortho has demonstrated likelihood of success on the merits or sufficiently serious questions going to the merits to warrant litigation and a balance of the hardships tipping in its favor. However, because courts have considered the interrelationship between the two prongs, we note briefly our views on the question of likelihood of success on the merits. *See Kahn,* 604 F.2d at 759:

> "If the element of irreparable harm is prerequisite for relief where the plaintiff must show probable success on the merits, then *a fortiori* where the plaintiff establishes something less than probable success on the merits, need for proof of the threat of irreparable damage is even more pronounced." (quoting *Triebwasser & Katz v. American Telephone & Telegraph Co.,* 535 F.2d 1356, 1359 (2d Cir.1976).

B. *Likelihood of Success on the Merits/Serious Questions Going to the Merits:*

Ortho's claims fall into two categories: (1) claims that Abbott is abusing its monopoly power or attempting to monopolize through monopoly leveraging, in violation of Section 2 of the Sherman Act; and (2) claims that Abbott's price structure and/or use of DMS are effectively illegal tying arrangements in violation of Section 1 of the Sherman Act and Section 3 of the Clayton Act, and New York General Business Law § 340. We find that on the state of the record thus far, plaintiff has demonstrated serious questions going to merits on both categories of claims, but has not shown likelihood of success.

(1) *Monopoly Leveraging:*

Section 2 of the Sherman Act makes it unlawful to "monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations ..." 15 U.S.C. § 2.

Each of the activities which Section 2 seeks to proscribe has its own elements. Unlawful monopolization has two elements: "(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *United States v. Grinnell Corp.*, 384 U.S. 563, 570–571, 86 S.Ct. 1698, 1704, 16 L.Ed.2d 778 (1966). Attempted monopolization has three elements: "(1) that the defendant has engaged in predatory or anti-competitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power." *Spectrum Sports, Inc. v. McQuillan,* — U.S. —, — – —, 113 S.Ct. 884, 890–891, 122 L.Ed.2d 247 (1993).

Although monopolization and attempted monopolization are separate offenses under the antitrust law, and Ortho alleges that Abbott has committed both, the allegations can be reduced to essentially one theory. Ortho alleges that Abbott has leveraged its lawfully gained monopoly power in the HTLV and HIV markets to unlawfully monopolize or attempt to monopolize the markets in the other three tests through an anti-competitive pricing scheme which forces purchasers to buy all five tests from Abbott. In the same vein, Ortho alleges that Abbott is leveraging its monopoly power in DMS by refusing to offer DMS to purchasers who wish to buy three or fewer tests.

■ Turning briefly to the DMS question first, there are a number of facts which have not been established but which may make plaintiff's case difficult to prove. First of all, because the ARC owns DMS outright, it is probably inappropriate to include the ARC in an estimate of Abbott's market power in DMS. Therefore, it is unclear whether Abbott actually possesses the requisite market power to sustain a leveraging claim. Secondly, the parties dispute whether Abbott has actually refused to offer DMS to customers

purchasing fewer than four tests. However, Abbott's bundling of the DMS program with its four and five assay packages does raise a serious question going to the merits of the claim to make it a fair ground for litigation.

■ The heart of plaintiff's leveraging claims revolves around Abbott's pricing structure. It is clear that Abbott satisfies the first element of a monopolization claim, monopoly power, because Abbott has 90 percent of the market share in HTLV, and 87 percent of the market share in HIV. It is a closer call whether Abbott enjoys monopoly power in the HBsAg and Anti-core markets, where Abbott's market share is approximately 70 percent.[6] Courts routinely find monopoly power where the market share is greater than 70 percent. *See Grinnell*, 384 U.S. at 571, 86 S.Ct. at 1704 (87 percent of the market constituted monopoly); *Hiland Dairy, Inc. v. Kroger Co.*, 402 F.2d 968, 974 & n. 6 (8th Cir.1968), *cert. denied*, 395 U.S. 961, 89 S.Ct. 2096, 23 L.Ed.2d 748 (1969) (surveying cases and noting that percentages greater than 70 percent generally are found to constitute monopoly power.)

The critical question therefore becomes whether Abbott has abused its monopoly power in HTLV and HIV either to maintain monopoly power in those markets and the Anti-core and HBsAg tests or to attempt to attain monopoly power in those tests, and, in the case of attempted monopolization, whether there is a dangerous probability of success.

■ Ortho alleges that the type of anti-competitive behavior in which Abbott is engaging is monopoly leveraging. Monopoly leveraging is where a party uses its monopoly power in one market to distort or affect competition in another market. The Supreme Court has explained that "the use of monopoly power, however lawfully acquired, to foreclose competition, to gain a competitive advantage, or to destroy a competitor, is unlawful." *United States v. Griffith*, 334

---

**6.** For the purposes of this motion, we have concluded that it is inappropriate to exclude the ARC from the calculation of market share, as Abbott would have the Court do. The only reason offered for such exclusion is that the ARC contract will be expiring at the end of the year.

By that logic, we should include an estimate of the new market share which Abbott will enjoy by virtue of the new CCBC master contract. Rather than engage in such speculation, we prefer to assess market share as it exists at this point in time.

U.S. 100, 107, 68 S.Ct. 941, 945, 92 L.Ed. 1236 (1948). In this case, Ortho alleges that by bundling together the tests which consumers prefer to buy from Abbott, the HIV and the HTLV, with the other three tests which consumers may wish to purchase from another manufacturer, at a price which cannot be matched by Ortho without drastically cutting its prices or giving the tests away free, Abbott effectively closes out all competition.

Ortho relies principally on two cases in support of its monopoly leveraging claim: *SmithKline Corp. v. Eli Lilly & Co.*, 575 F.2d 1056 (3d Cir.), *cert. denied*, 439 U.S. 838, 99 S.Ct. 123, 58 L.Ed.2d 134 (1978), and *Berkey Photo Inc. v. Eastman Kodak Co.*, 603 F.2d 263 (2d Cir.1979), *cert. denied*, 444 U.S. 1093, 100 S.Ct. 1061, 62 L.Ed.2d 783 (1980).

In *SmithKline*, the Third Circuit was faced with a factual scenario which appears to be similar at this stage of the record to the one confronting this Court. The parties in *SmithKline* were pharmaceutical manufacturers, which had each developed certain antibiotics. The defendant, Eli Lilly, had a lawful monopoly in two of the drugs, Keflin and Keflex, by virtue of patents. In a third, Kefzol, Eli Lilly did not have a patent and faced competition on that drug from Smith-Kline, which marketed an equivalent called Ancef. The lawsuit arose when Eli Lilly adopted a new pricing structure which effectively bundled Keflin and Keflex together with Kefzol, at a price which would have forced SmithKline to offer Ancef rebates of between 16 and 33 percent in order to compete. We say "effectively bundled" because purchasers were still free to buy the drugs separately, thus avoiding liability on a tying claim, but the pricing structure made that choice economically irrational.

The Third Circuit found that Eli Lilly's pricing plan violated Section 2 of the Sherman Act. The court first defined the relevant product market as that composed of all of the various types of cephalosporin antibiotics, and affirmed the district court's finding that Eli Lilly possessed monopoly power in that market. The court then went on to find that Eli Lilly's monopoly power was being unlawfully maintained by the pricing structure. The court's language is instructive:

In sum, the act of willful acquisition and maintenance of monopoly power was brought about by linking products on which Lilly faced no competition—Keflin and Keflex—with a competitive product, Kefzol. The result was to sell all three products on a noncompetitive basis in what would have otherwise been a competitive market for Ancef and Kefzol. The effect of the [new pricing plan] was to force SmithKline to pay rebates on one product, Ancef, equal to rebates paid by Lilly based on volume sales of three products ... The goal of the plan was to associate Lilly's legal monopolistic practices with an illegal activity that directly affected the price, supply, and demand of Kefzol and Ancef. Were it not for Lilly's [new pricing plan], the price, supply and demand of Kefzol and Ancef would have been determined by the economic laws of a competitive market. The [new pricing plan] blatantly revised those economic laws and made Lilly a transgressor under § 2 of the Sherman Act.

575 F.2d at 1065.

Abbott argues that *SmithKline* is not authority for a leveraging claim, because, among other reasons, the court found that there was only one market at issue, that of cephalosporin drugs, and the Second Circuit requires two markets for a leveraging claim. While that is true, the reasoning of *Smith-Kline* is still persuasive, and has even greater force where a similar pricing scheme is employed where there are two or more markets.

Ortho has demonstrated that there are sufficiently serious questions regarding whether Abbott's new pricing scheme has similar anti-competitive qualities. The linking of the HTLV and HIV tests, in which Abbott has a lawful monopoly, with the other three tests in which it faces competition at prices which would allegedly force Ortho to give rebates of over 100% in certain combinations, more likely than not will foreclose competition for these customers. The situation is especially severe where, as here, the contract is for an extended period of time.

Ortho relies on the *Berkey* decision for the proposition that a violation of Section 2 based on a claim of monopoly leveraging does not have to entail an actual monopolization of the leveraged market. Rather, it is sufficient if competition in the leveraged market, here the three tests over which Abbott does not already have monopoly power, is distorted. Defendant argues that the *Berkey* decision was wrongly decided, and cites to cases in other circuits which hold that merely gaining a competitive advantage in a second market by means of monopoly power in a primary market is not a violation of the antitrust law. Abbott also maintains that it has not contravened *Berkey,* because that case does not prohibit actions taken in pursuit of "a valid business policy." 603 F.2d at 284.

There are certain difficulties with defendant's argument. First, Abbott downplays the fact that *Berkey* remains the law of this Circuit. *Berkey* involved a challenge to Kodak's use of its monopoly in the camera, film and color paper markets to affect the photofinishing market, in which it faced competition from Berkey. The court found that Kodak was never close to attaining monopoly power in the photofinishing market, and therefore could not be held liable for "attempted monopolization" because the third element, dangerous probability of success, had not been met. However, the court explained that a firm still violates Section 2 where, although not attempting to monopolize the second market, the firm uses its monopoly power in the first market to distort competition or to gain a competitive advantage in the second. The court stated:

> This conclusion appears to be an inexorable interpretation of the antitrust laws. We tolerate the existence of monopoly power ... only insofar as necessary to preserve competitive incentives and to be fair to the firm that has attained its position innocently. There is no reason to allow the exercise of such power to the detriment of competition, in either the controlled market or any other. That the competition in the leveraged market may not be destroyed but merely distorted does not make it more palatable.

603 F.2d at 275.

\*     \*     \*     \*     \*     \*

Accordingly, the use of monopoly power attained in one market to gain a competitive advantage in another is a violation of § 2, even if there is no attempt to monopolize the second market. It is the use of economic power that creates the liability. *Id.* at 276.

The *Berkey* analysis has been recently reaffirmed by this Court in *Viacom Int'l Inc. v. Time Inc.,* 785 F.Supp. 371, 378 (S.D.N.Y. 1992), where the court held that a Sherman Act claim "is stated both where a company leverages power in one market to create monopoly in another, *see United States v. Griffith,* 334 U.S. 100, 68 S.Ct. 941, 92 L.Ed. 1236 (1948), and where a company uses monopoly power in one market to impede competition in another, whether or not it attempts to monopolize the second market, *Berkey,* 603 F.2d at 275, with resulting 'tangible harm to competition' *Twin Laboratories, Inc. v. Weider Health & Fitness,* 900 F.2d 566, 571 (2d Cir.1990)". Plaintiff has demonstrated to the Court's satisfaction that Abbott's new pricing structure may, at the least, impede competition in the markets for the three tests in which Abbott does not have monopoly power.

Another difficulty with Abbott's argument is that certain of the cases Abbott cites in opposition to the monopoly leveraging claim are cases from other circuits which, although in conflict with *Berkey,* simply do not control in this Circuit. For example, defendant relies on *Fineman v. Armstrong World Industries, Inc.,* 980 F.2d 171 (3d Cir.1992) *cert. denied,* —— U.S. ——, 113 S.Ct. 1285, 122 L.Ed.2d 677 (1993), which involved a challenge to defendant's alleged use of monopoly power in the resilient floor covering market to gain a competitive advantage in the market for video magazines sold to distributors of floor coverings. The *Fineman* court held that in order to state a claim under Section 2 for monopoly leveraging, it is insufficient to show that the firm has used its monopoly power in one market to gain a competitive advantage in a second market; rather, it is necessary to demonstrate threatened or actual monopoly in the leveraged market. Al-

though *Fineman* flatly rejects the *Berkey* holding that proof of use of monopoly power in a primary market in order to gain a competitive advantage in the leveraged market is sufficient, *Fineman* simply does not control our decision. The same holds true for the Ninth Circuit's rejection of *Berkey* in *Alaska Airlines, Inc. v. United Airlines, Inc.*, 948 F.2d 536, 541–549 (9th Cir.1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 1603, 118 L.Ed.2d 316 (1992).

Abbott however does present arguments which give the Court pause. Abbott contends that its pricing structure arises from its ability to provide all five tests, which is an advantage it possesses legitimately due to its size. Abbott explains that its bundling is merely a package discount, *i.e.* a lower per-test price when more tests are purchased. At oral argument, Abbott drew the analogy to a car rental agency, which can offer lower prices when renting a fleet of cars than when renting one car separately.

In support of this argument, Abbott relies on *Chillicothe Sand & Gravel Co. v. Martin Marietta*, 615 F.2d 427 (7th Cir.1980). In *Chillicothe*, the court explained that one must look to the complained of conduct's effect on competition, and not on specific competitors. Furthermore, the court ruled that where a package deal is offered but the customer is also able to purchase the components of the package separately at greater cost, and where the package price is not below cost, there is no antitrust violation. *See* also *Southern Pacific Commun. Co. v. AT & T*, 556 F.Supp. 825, 947 (D.D.C.1983), *aff'd*, 740 F.2d 980 (D.C.Cir.1984), *cert. denied*, 470 U.S. 1005, 105 S.Ct. 1359, 84 L.Ed.2d 380 (1985).

Abbott argues that the CCBC itself recognized that a package deal including all five assays would result in greater volume of sales and could save its members considerable sums of money, and that is why it specifically requested the bundling in the RFP. Ortho argues in response that this is not a true volume discount, because a BDC which purchases all five tests from Abbott obtains lower prices per test under the master agreement than a BDC which purchases four or three tests from Abbott even if the latter does a far greater volume of testing overall.

Because Ortho has not met its burden of demonstrating that it would suffer irreparable harm if an injunction does not issue, we do not need to determine who has the better argument on the monopoly leveraging claim. It suffices to say that plaintiff has not proven that it is likely to succeed on the merits, but it has shown that there are sufficiently serious questions on the merits to warrant litigation. We will address the question of the balance of the hardships below.

### (2) *Illegal Tying Claims:*

Plaintiff's claims regarding illegal tying may be more difficult to prove, but again it appears that there are sufficiently serious questions going to the merits of these claims to warrant preliminary injunctive relief if Ortho had demonstrated both that the balance of the equities is in its favor and that it would suffer irreparable injury. Although the law of tying is well-developed, the facts of this case, specifically that the tests are available for separate purchase and are therefore not explicitly tied, make the law more difficult to apply. With regard to plaintiff's second tying argument, that DMS is the tying product used to force purchasers to buy either four or five tests, we noted above that it is unclear whether DMS is separately available or not.

Ortho's tying claims come under Section 1 of the Sherman Act and Section 3 of the Clayton Act. Section 1 of the Sherman Act provides:

> Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal ...

Section 3 of the Clayton Act provides:

> It shall be unlawful for any person engaged in commerce, in the course of such commerce, to ... make a sale or contract for sale of goods ... for use, consumption or resale within the United States ... or fix a price charged therefor, or discount from, or rebate upon, such price, on the condition, agreement, or understanding that the ... purchaser thereof shall not

use or deal in the goods ... of a competitor or competitors of the ... seller, where the effect of such ... sale, or contract for sale or such condition, agreement or understanding may be to substantially lessen competition or tend to create a monopoly in any line of commerce.

It is well established that Section 1 of the Sherman Act does not render illegal every contract that in any way restrains trade, but rather only those contracts which effect an unreasonable restraint of trade. *Arizona v. Maricopa County Medical Society,* 457 U.S. 332, 102 S.Ct. 2466, 73 L.Ed.2d 48 (1982). The courts have formulated two analytical approaches to determining when a restraint on trade is unreasonable: the *per se* test, and the "rule of reason" test. The basic difference between the two approaches lies in the extent to which a court must examine the actual effect on competition which an allegedly anti-competitive business practice has. Under the rule of reason test, the court must determine the competitive impact of a particular practice in the context of a relevant market. Under the *per se* rule, a court does not conduct this extensive inquiry, because the practice in question has been held to be manifestly anti-competitive.

The Supreme Court has held that under certain conditions, tie-ins are *per se* unreasonable restraints of trade under the antitrust laws. In *Jefferson Parish Hosp. v. Hyde,* 466 U.S. 2, 12, 104 S.Ct. 1551, 1558, 80 L.Ed.2d 2 (1984), the Supreme Court explained that

> the essential characteristic of an invalid tying arrangement lies in the seller's exploitation of its control over the tying product to force the buyer into the purchase of a tied product that the buyer either did not want at all, or might have preferred to purchase elsewhere on different terms. When such "forcing" is present, competition on the merits for the tied item is restrained and the Sherman Act is violated.

Ortho argues that Abbott's pricing structure constitutes a *per se* illegal tie-in because Abbott is exploiting its control over the HIV and HTLV markets to force the buyer into purchasing the other three tests,

some or all of which the buyer might rather purchase from Ortho. The DMS tying claim is essentially the same. The packaging or tying of different products is only condemned when the firm possesses enough market power in the tying product to force the purchaser to buy the tied product. Furthermore, where the purchaser is free to buy the items separately, no tie-in exists. *Northern Pacific Railroad Corp. v. United States,* 356 U.S. 1, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958).

The elements of an illegal tie-in arrangement have been consistently stated by the Second Circuit as the following:

> (1) a tying and a tied product; (2) evidence of actual coercion by the seller forcing the buyer to accept the tied product; (3) sufficient economic power in the tying market to coerce purchaser acceptance of the tied product; (4) anticompetitive effects in the market for the tied product; and (5) the involvement of a "not insubstantial" amount of interstate commerce in the tied product.

*Suburban Propane v. Proctor Gas, Inc.,* 953 F.2d 780, 788 (2d Cir.1992).

Ortho concedes, as it must, that there is nothing in the CCBC contract which explicitly conditions the purchase of the HIV and HTLV tests on purchase of any of the other three tests. Therefore, Ortho is constrained to argue that although purchasers appear to have the choice to buy the tests separately, in fact, that choice is illusory because the prices have been set to ensure that any rational purchaser will be coerced to buy all five tests. With regard to DMS, Ortho argues that there is an explicit tie by virtue of Abbott's refusal to offer DMS to purchasers of three tests or less; Abbott responds that in fact, it is willing to negotiate individual deals for DMS to purchasers of sufficient volume, and in any event, it does not possess market power in DMS.

There is some case law to support the position that a tie does not have to be explicit but can instead be inferred from the pricing structure of two products and the market power which the party has. *See* for example, *United States v. Loew's, Inc.,* 371 U.S. 38, 54, 83 S.Ct. 97, 106, 9 L.Ed.2d 11 (1962) (remedy

for antitrust violation included provision that company could not use an unjustified price differential between goods sold separately and those sold as a package which would have the effect of creating a tie); *Virtual Maintenance, Inc. v. Prime Computer, Inc.,* 957 F.2d 1318, 1323 (6th Cir.) *vacated and remanded on other grounds,* — U.S. —, 113 S.Ct. 314, 121 L.Ed.2d 235 (1992) ("A tying arrangement clearly exists here because the large price differential between the software support alone and the software/hardware maintenance package induces all rational buyers of Prime's software support to accept its hardware maintenance").

Absent an explicit condition in the contract, there is a question of fact for the factfinder regarding the existence of the tie, and we are unable on this state of the record to determine if plaintiff is likely to prevail on the merits of the tying claims. What is evident however is that there are sufficiently serious questions going to the merits of the tying claims to make them a fair ground for litigation.

(3) *Balance of the Hardships:*

■ We cannot find on this state of the record that the balance of the hardships tip decidedly towards Ortho. If this Court enjoins the CCBC contract, Abbott will most likely negotiate a new contract that will result in higher prices charged to the BDCs. The centers will then pass this higher cost on to the ultimate consumers, which are the hospitals and patients who need blood for transfusions. If it turns out that the injunction was improvidently granted, that cost to the public cannot be recouped. On the other hand, if the contract goes into effect on June 1, 1993, and the Court later finds in favor of Ortho, all that has been lost are profits which Ortho should have realized, and which the Court can award. Thus, the balance of the equities does not tip decidedly towards Ortho in this case.

Finally, we wish to acknowledge the brief we received from the CCBC as amicus curiae. We appreciate the various concerns which the CCBC expressed regarding the possible consequences which a preliminary injunction could have on the BDC market. However, we want to stress that the CCBC's concern regarding "confusion" which the BDCs may experience if an injunction were to issue is not resolved by our denial of the preliminary relief. A preliminary injunction is just that: a decision made at a preliminary stage of the proceedings to address the immediate circumstances. Our denial of the preliminary injunction should not leave the impression that the Court has addressed the merits of Ortho's claims in any but the most preliminary way. Six months from now, after trial on the merits, the application of the law to the facts may appear very differently, and a permanent injunction may be manifestly appropriate. Any uncertainty this state of affairs may cause the CCBC and its members is an unfortunate but inevitable consequence of pending litigation.

### Conclusion

For the reasons stated above, we deny Ortho's motion for a preliminary injunction. We set the case down for trial on November 15, 1993. We ask that Magistrate–Judge Grubin continue her pretrial supervision of discovery in this case.