**VIRGIN ATLANTIC AIRWAYS LIMITED, Plaintiff,**

v.

**BRITISH AIRWAYS PLC, Defendant.**

**No. 93 Civ. 7270 (MGC).**

United States District Court, S.D. New York.

Dec. 30, 1994.

---

**56**

Simpson Thacher & Bartlett, by Charles E. Koob, Kenneth R. Logan, Annette C. Rizzi, David E. Vann, Dennis C. O'Donnell, Daniel E. Reynolds, New York City, for plaintiff.

Sullivan & Cromwell, by John W. Dickey, John L. Warden, Mark McCall, Daryl A. Libow, Lisamichelle Davis, E. Marcellus Williamson, New York City, for defendant.

## MEMORANDUM OPINION AND ORDER

CEDARBAUM, District Judge.

The parties are competing international airlines. Plaintiff Virgin Atlantic Airways Limited charges defendant British Airways PLC with a wide variety of anticompetitive conduct and asserts claims under the United States antitrust laws and the common law. British Airways moves to dismiss on the grounds of (1) act of state, (2) political question, (3) international comity, and (4) forum non conveniens. It also argues that the complaint fails to state a claim. For the reasons discussed below, the motion is granted in part and denied in part.

### Background

British Airways is one of the oldest and largest airlines in the world. Its predecessors were nationalized by the British Government in 1939, and remained state-owned until 1987. Today it offers service to well over 100 cities around the world. By contrast, Virgin Atlantic began airline passenger service in 1984 with one airplane offering service between London and Newark. Since then it has grown significantly and now competes directly with British Airways in airline passenger service. The conduct Virgin Atlantic complains of in this lawsuit must be viewed in the context of the structure of the transatlantic airline industry and the way in which airline tickets are sold.

### A. Structure of the Transatlantic Airline Industry

A complex web of treaties, international agreements and domestic regulations limit the type and amount of service individual airlines may offer. The most important is a 1977 agreement between the United States and the United Kingdom known as "Bermuda II."[1]

Bermuda II regulates air service between particular cities in the United States and the United Kingdom. No airline can fly any route, schedule specific flights, or set fares except in accordance with Bermuda II. Under Bermuda II, service is permitted to London only from 24 "gateway cities" in the United States. To fly a particular route, an airline must be "designated" by the appropriate regulatory agencies in both countries. Presently, British Airways is designated to fly between London and 21 gateway cities in the United States. No other airline is designated to serve more than seven United States gateway cities. Virgin Atlantic flies between London and six gateway cities: Boston, New York, Newark, Orlando, Miami, and Los Angeles. The parties are direct competitors on these routes.

Another major constraint on transatlantic passenger air travel is that Heathrow Airport is operating at full capacity. Heathrow is the preferred international airport in London, but it cannot handle the volume of air traffic to and from that city. This has two significant consequences. The first is that the right to use a runway at Heathrow at a particular time is extremely valuable. The right to land or take off at a particular time

---

1. Agreement on Air Transport Services, July 23, 1977, United States—United Kingdom, 28 U.S.T. 5367, T.I.A.S. No. 8641.

is known as a "slot." Heathrow is one of a small number of slot-restricted airports. Slots are allocated at Heathrow under a grandfather system. An airline keeps the right to a particular slot as long as it uses it. An airline can obtain new slots only by purchasing them from other airlines or by applying for slots as they are relinquished by other carriers. British Airways controls approximately 40 percent of the slots at Heathrow.

The second significant consequence of congestion at Heathrow is that growth in passenger air service to and from London can only occur through Gatwick Airport which serves as an overflow facility for Heathrow. Thus, Virgin Atlantic must fly from Gatwick to three of the gateway cities it serves in the United States, whereas British Airways is able to offer transatlantic service from Heathrow to all of its gateway cities. British Airways does use Gatwick, however, and it controls 31 percent of the Gatwick slots.

The complaint alleges that British Airways has monopoly power at both Heathrow and Gatwick. (Compl. ¶¶ 56, 57) It points to the percentage of slots controlled at each airport and a variety of other numbers to support those allegations. For example, according to the complaint, British Airways controls approximately 39 percent of the market for airline passenger services between cities in the United States and the United Kingdom; Virgin Atlantic controls 11 percent. (Compl. ¶ 62) More specifically, British Airways controls 40 percent of the market for air passenger service between London and gateway cities in the United States; Virgin Atlantic controls approximately 12 percent. (Compl. ¶ 63)

The complaint also discusses travel between particular cities, which it defines as "city-pair markets." For example, the complaint alleges that British Airways holds approximately 51 percent of the market for air passenger travel between London and New York and approximately 45 percent of the market for air travel between London and Los Angeles. (Compl. ¶ 59) Further refining this analysis, the complaint also discusses travel between particular airports, which it refers to as "airport-pair markets." The complaint alleges that British Airways controls approximately 46 percent of the market for air passenger travel between Heathrow and New York's John F. Kennedy International Airport, and 45 percent of the market for air passenger travel between Heathrow and Los Angeles International Airport. (Compl. ¶ 60)

### B. Loyalty Programs

Loyalty programs are marketing devices which airlines use to attract customers. The most familiar are frequent flyer programs under which individual travellers are given rewards, incentives and discounts for repeatedly patronizing a particular airline. Travel agent commission override ("TACO") programs are incentive programs designed to encourage travel agents to book their customers on a particular airline. Typically, a TACO pays a travel agent a bonus when he or she has sold a specified number of tickets. The complaint alleges that "[w]hen the TACO commission or bonus increases more than proportionally to the revenue generated with a particular airline, the travel agent has very significant economic incentives to steer consumers to a particular airline in order to reach the target that triggers the TACO." In addition to targeting individual travellers with frequent flier programs and travel agents with TACOS, airlines may offer incentive programs to institutional customers which purchase large numbers of tickets. These are referred to generically as "corporate travel programs" and can be designed in a variety of ways.

### C. Conduct Alleged in the Complaint

In a 50 page narrative complaint, Virgin Atlantic complains about the following five categories of conduct by British Airways.

#### 1. Predatory Activities

Virgin Atlantic complains of a hodge-podge of events under the loose heading of "predatory activities." British Airways dropped certain flights and used the slots made available to add flights to routes on which it faced new competition from Virgin Atlantic. (Compl. ¶¶ 75–76) The complaint refers to this practice as "switching slots." (Compl.

¶ 1(iii)) British Airways "refused to accept properly endorsed" Virgin Atlantic tickets and instructed some of its ticket agents not to accept Virgin Atlantic coupons. (Compl. ¶ 78) British Airways also "refused" to renew a maintenance contract with Virgin Atlantic on favorable terms. Prior to 1989, Virgin Atlantic had hired British Caledonian Airways to provide maintenance services at Gatwick. In 1988 British Airways purchased British Caledonian. When the maintenance contract came up for renewal, British Airways "sought to double the price of the existing contract and offered to service only two planes in Virgin's four plane fleet." This "forced Virgin to hire approximately 200 people as a maintenance crew and to send planes to Ireland for heavy maintenance." (Compl. ¶ 77)

### 2. "Dirty Tricks"

The complaint alleges that British Airways has pursued a prolonged and deliberate campaign of underhanded tactics designed to drive Virgin Atlantic out of business. According to the complaint, British Airways "initiated a campaign to publicly discredit Virgin and [Virgin's Chairman] Richard Branson." (Compl. ¶ 81) In 1991 British Airways made a series of false statements to the press about Virgin Atlantic. (Compl. ¶ 82) British Airways attempted to steal Virgin Atlantic's customers by contacting them directly and attempting to persuade them to switch airlines. (Compl. ¶ 83) In some instances this poaching was accomplished by falsely telling Virgin Atlantic ticketholders that their flights had been delayed or overbooked. (Compl. ¶ 84) According to the complaint, British Airways employees approached Virgin Atlantic customers in airports and offered them incentives to switch airlines. (Compl. ¶ 85) British Airways improperly accessed confidential Virgin Atlantic flight information. (Compl. ¶ 86) British Airways destroyed documents to cover up its dirty tricks. (Compl. ¶ 88)

### 3. British Airways' Investment in USAir

In 1993 British Airways made a significant investment in USAir, and the two companies have entered into an "alliance" to provide airline service between the United States and the United Kingdom. As part of this alliance, British Airways and USAir will engage in "code-sharing," an industry practice whereby one airline's flight is listed in published schedules as a flight of the other airline. This practice facilitates connections between the two airlines' flights. British Airways and USAir have also combined their frequent flier programs. USAir customers now receive mileage credit for flights on British Airways. In addition, British Airways and USAir have agreed to a "wet lease" arrangement whereby British Airways will fly between Gatwick and certain gateway cities using USAir aircraft and crews.

### 4. TACOs and Corporate Travel Programs

Virgin Atlantic charges that British Airways has structured its TACOs and corporate travel programs in such a way as to exploit its existing monopoly at Heathrow to gain a competitive advantage and foreclose competition in the market for transatlantic passenger airline service. (Compl. ¶¶ 100–09) It alleges that British Airways' TACOs and corporate travel programs operate as exclusive dealing arrangements between the airline and participating companies and travel agents. (Compl. ¶ 102)

Specifically, Virgin Atlantic charges that British Airways grants rebates and incentives to corporate customers and travel agents only on the condition that they purchase all or a certain high percentage of their travel requirements from British Airways. (Compl. ¶ 103) This system, Virgin Atlantic alleges, makes it "economically irrational" for corporations and travel agents not to use British Airways. The key to the system is that British Airways offers discounts and rebates based on the number of tickets a customer purchases on all of its flights, not just on flights between the United States and the United Kingdom. Because British Airways serves so many more destinations from Heathrow than any other airline, inevitably, major customers will have to purchase at least some British Airways tickets. The carrot offered by British Airways' loyalty programs will then induce these customers to

purchase British Airways tickets on transatlantic flights.

### 5. Discriminatory Treatment of Virgin Atlantic Passengers

The complaint alleges that British Airways exploits its monopoly at Heathrow to discourage passengers from flying into the airport on another airline to connect with a British Airways flight. According to the complaint, British Airways "has attempted to coerce Virgin passengers into flying their entire trip with [British Airways] by refusing to confirm Virgin passenger reservations on connecting [British Airways] flights in a timely manner." (Compl. ¶ 111)

### D. Specific Claims Pleaded in the Complaint

The complaint fashions eight claims for relief out of the conduct described above. The first claim is brought under § 2 of the Sherman Act, 15 U.S.C. § 2, and alleges that British Airways has attempted to monopolize transatlantic airline passenger service between the United States and the United Kingdom. The second claim is for monopoly leveraging and is also brought under § 2 of the Sherman Act. It alleges that British Airways has used its monopoly over Heathrow and Gatwick to obtain an unfair competitive advantage in the market for transatlantic airline passenger service. The third claim is brought under § 1 of the Sherman Act, 15 U.S.C. § 1, and alleges that British Airways' corporate travel programs and TACOs constitute illegal contracts that unreasonably restrain trade. The fourth claim is brought under § 7 of the Clayton Act, 15 U.S.C. § 18, and challenges British Airways' investment in USAir as an unreasonable restraint of trade. The fifth claim is brought under § 1 of the Sherman Act and also challenges the USAir transaction as an unreasonable restraint of trade. The sixth claim is a common law claim of unfair competition. The seventh claim is a common law claim of interference with contractual relations. The eighth claim is a common law claim of interference with prospective business relations.

### Discussion

When considering a motion to dismiss, the complaint must be read generously. The court must presume the truth of all factual allegations in the complaint and all inferences must be drawn in favor of the pleader. *First Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763, 765 (2d Cir. 1994). The motion must be denied "unless it appears beyond doubt that plaintiff can prove no set of facts in support of his claim that would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957).

In its motion to dismiss, British Airways attacks the complaint in three ways. First, it argues that the complaint should be dismissed under a variety of justiciability doctrines. Second, it urges that the case should be dismissed on the basis of forum non conveniens. Third, it attacks the sufficiency of the complaint, and argues that Virgin Atlantic has failed to state a claim. These arguments are discussed separately.

### A. Justiciability

The act of state doctrine "precludes the courts of this country from inquiring into the validity of the public acts a recognized foreign sovereign power committed within its own territory." *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 401, 84 S.Ct. 923, 926, 11 L.Ed.2d 804 (1964). British Airways argues that the act of state doctrine requires dismissal of the complaint because this case "fundamentally involves an inquiry into the sovereign acts of the U.K. government." An examination of the complaint shows that the complaint does describe in detail certain acts of the U.K. government (most importantly its pre–1987 operation of British Airways as a state-owned enterprise), but none of those acts is the conduct that is alleged as the basis of Virgin Atlantic's claims. The acts complained of—the predatory activities, the dirty tricks campaign, the corporate travel discounts and TACOs, the USAir transaction, and the discriminatory treatment of plaintiff's customers—all are alleged to be defendant's acts, not the conduct of the U.K. government. Thus, this is not a situation where the court will be forced to inquire "into the

acts and conduct of the officials of the foreign state, its affairs and its policies and the underlying reasons and motivations for the actions of the foreign government." *O.N.E. Shipping Ltd. v. Flota Mercante Grancolombiana, S.A.,* 830 F.2d 449, 452 (2d Cir.1987), *cert. denied,* 488 U.S. 923, 109 S.Ct. 303, 102 L.Ed.2d 322 (1988); *see also W.S. Kirkpatrick & Co., Inc. v. Environmental Tectonics Corp., Int'l,* 493 U.S. 400, 409–10, 110 S.Ct. 701, 706–07, 107 L.Ed.2d 816 (1990) (act of state doctrine does not apply when the validity of a foreign sovereign act is not at issue).

The two cases cited by British Airways do not point to a different conclusion. In *O.N.E. Shipping, supra,* the plaintiff challenged a series of contracts between Colombia's national shipping line and two private companies as a conspiracy to exclude competition, fix prices, divide markets, and monopolize. 830 F.2d at 450–51. In *McElderry v. Cathay Pacific Airways, Ltd.,* 678 F.Supp. 1071 (S.D.N.Y.1988) the plaintiff sought to challenge the defendant airline's schedule of excess baggage fees. In both cases the court dismissed the complaint because the conduct complained of was "compelled," *O.N.E. Shipping,* 830 F.2d at 453, or "necessitated," *McElderry,* 678 F.Supp. at 1079, by the laws of a foreign sovereign. Nothing in the complaint in this case suggests that the conduct which Virgin Atlantic alleges as the basis for liability is "compelled" or "necessitated" by the U.K. government.

■ Similar reasoning applies to British Airways' arguments that this court should decline jurisdiction out of deference either to the executive branch (under the political question doctrine) or to the government of the United Kingdom (under the doctrine of international comity). Defendant argues that the political question doctrine applies because this is a case that, "if adjudicated, may interfere with the executive branch's ability to conduct foreign affairs or may cause embarrassment to the executive branch in carrying out that constitutionally delegated responsibility." That is hyperbole. The only potential "embarrassment" British Airways identifies is that the United States and the United Kingdom are engaged in "ongoing and difficult" negotiations that may result in revision of Bermuda II. The evidence British Airways offers in support of this argument is a copy of a letter to the Secretary of the Department of Transportation signed by four members of the United States House of Representatives Committee on Public Works and Transportation. The letter urges the Executive Branch not to renounce Bermuda II and not to terminate the code-sharing agreement between British Airways and USAir. The letter says nothing about dirty tricks, slot switching, corporate travel programs, TACOs, or most of the other conduct alleged in the complaint. The letter does not show that adjudicating a suit involving such issues would "embarrass" the Executive Branch because this is not a controversy which "revolves around policy choices and value determinations constitutionally committed for resolution to the halls of Congress or the confines of the Executive Branch." *Japan Whaling Ass'n v. American Cetacean Soc'y,* 478 U.S. 221, 230, 106 S.Ct. 2860, 2866, 92 L.Ed.2d 166 (1986). The fact that this case may involve international agreements and may brush against foreign relations does not render it nonjusticiable. *See Japan Whaling Ass'n,* 478 U.S. at 230, 106 S.Ct. at 2866 ("courts have the authority to construe treaties and executive agreements"); *Baker v. Carr,* 369 U.S. 186, 211, 82 S.Ct. 691, 706, 7 L.Ed.2d 663 (1962) ("it is error to suppose that every case or controversy which touches foreign relations lies beyond judicial cognizance").

■ The same sorts of concerns underlie the doctrine of international comity.

"Comity," in the legal sense, is neither a matter of absolute obligation on the one hand, nor of mere courtesy and good will upon the other. But it is the recognition which one nation allows within its territory to the legislative, executive, or judicial acts of another nation, having due regard both to international duty and convenience, and to the rights of its own citizens or of other persons who are under the protection of its laws.

*O.N.E. Shipping Ltd. v. Flota Mercante Grancolombiana, S.A.,* 830 F.2d 449, 451 n. 3 (2d Cir.1987), *cert. denied,* 488 U.S. 923, 109 S.Ct. 303, 102 L.Ed.2d 322 (1988). More

practically, "a court may abstain from jurisdiction when the extraterritorial effect of a particular remedy is so disproportionate to harm within the United States as to offend principles of comity." *Consolidated Gold Fields, PLC v. Minorco, S.A.,* 871 F.2d 252, 263 (2d Cir.1989). Defendant has not made such a showing. The complaint alleges specific harms to competition and consumers in the United States and no showing has been made that a remedy for those harms would necessarily be "disproportionate." It is true that any relief granted in this case will have extraterritorial effect, but that alone does not make a case nonjusticiable.

B. *Forum Non Conveniens*

■■■■ The "central purpose" of forum non conveniens analysis is to determine where a trial will be most convenient and will serve the interest of justice. *R. Maganlal & Co. v. M.G. Chemical Co., Inc.,* 942 F.2d 164, 167 (2d Cir.1991). Forum non conveniens analysis proceeds in two steps. First, a defendant must demonstrate that an adequate alternative forum exists. *Blanco v. Banco Industrial de Venezuela, S.A.,* 997 F.2d 974, 980 (2d Cir.1993). If that threshold requirement is met, the court must then weigh the relevant private and public interest factors set forth in *Gulf Oil Corp. v. Gilbert,* 330 U.S. 501, 509, 67 S.Ct. 839, 843, 91 L.Ed. 1055 (1947). *Blanco,* 997 F.2d at 980; *Allstate Life Insurance Co. v. Linter Group Limited,* 994 F.2d 996, 1001 (2d Cir.), *cert. denied,* —— U.S. ——, 114 S.Ct. 386, 126 L.Ed.2d 334 (1993). The court must also give weight to the plaintiff's choice of forum, although a foreign plaintiff's choice is entitled to less weight than that of a citizen or resident. *Piper Aircraft Co. v. Reyno,* 454 U.S. 235, 255–56, 102 S.Ct. 252, 265–66, 70 L.Ed.2d 419 (1981). At each stage of the analysis, the moving party bears the burden of proving that the balance of convenience tilts strongly in favor of trial in the foreign forum. *R. Maganlal & Co,* 942 F.2d at 167. British Airways has not made such a showing.

The parties hotly dispute whether Virgin Atlantic could bring this action in an adequate alternative forum and have submitted extensive expert opinions and lengthy analy-ses of United Kingdom and European Community law. It is unnecessary, however, to rule on precisely what relief is available to plaintiff abroad because application of the *Gilbert* factors counsels against dismissing this action.

The Court of Appeals has summarized the *Gilbert* factors as follows:

(1) the ease of access to sources of proof; (2) the availability of compulsory process for attendance of unwilling witnesses; (3) the cost of obtaining attendance of willing witnesses; (4) practical problems involving the efficiency and expense of a trial; (5) enforceability of judgments; (6) administrative difficulties flowing from court congestion; (7) imposing jury duty on citizens of the forum; (8) the local interest in having controversies decided at home; and (9) the avoidance of unnecessary problems in the application of foreign law.

*Allstate Life Insurance Co.,* 994 F.2d at 1001. Neither party has presented any evidence on the sixth and seventh *Gilbert* factors. The fifth *Gilbert* factor is neutral. British Airways does significant business in both the United States and the United Kingdom, and a judgment could be enforced in either country.

As to the first four *Gilbert* factors, defendant argues that it would be more convenient for both parties to try this case in the United Kingdom because that is where most of the evidence and witnesses are located. Plaintiff argues that only some of the evidence is overseas and that wherever the action is tried, it will be necessary to transport documents and witnesses. There is merit to both arguments, although it seems more likely that the majority of the proof will be found in the United Kingdom. Both of the parties are English companies and a major part of the controversy involves events in that country. However, even though it might be more convenient to try this case in the United Kingdom, it would not be a significant burden to do so in New York. After all, both parties are airlines and can easily transport witnesses and documents to whichever forum is designated. Cf. *Laker Airways Ltd. v. Pan American World Airways,* 568 F.Supp. 811, 814 (D.D.C.1983) (court took judicial no-

tice of the fact that all parties were airlines and that the time involved and the expense of transporting witnesses would be minimal).

The two remaining *Gilbert* factors favor allowing this suit to proceed. The complaint alleges violations of the United States antitrust laws that have had a significant impact on customers and competition in the United States. The markets at issue are various permutations of transatlantic air passenger service. That is not a market that exists only in the United States or only in the United Kingdom. It touches both countries. Thus, even though some of the conduct alleged in the complaint occurred in the United Kingdom, there is a strong interest in having the case decided in the United States because that conduct is alleged to have had an effect here and to have violated the laws of this country. Moreover, allowing the suit to proceed in this court will avoid the unnecessary problem of asking a court in the United Kingdom to interpret and apply the United States antitrust laws, assuming that an English court would accept jurisdiction of a suit that arises under the antitrust statutes of the United States.

In sum, three of the *Gilbert* factors are neutral, four tilt slightly in favor of dismissing this action in favor of a court in the United Kingdom and two tilt strongly in favor of allowing the case to proceed. When the presumption, however slight, in favor of the plaintiff's choice of forum is added to the analysis, it cannot be said that defendant has demonstrated that the balance of convenience tilts strongly in favor of trial in the foreign forum. *R. Maganlal & Co,* 942 F.2d at 167. Accordingly, British Airways' motion to dismiss on the grounds of forum non conveniens is denied.

### C. *The USAir Transaction*

It is unclear whether Virgin Atlantic is pursuing this claim. At oral argument, when I pressed counsel for Virgin Atlantic to describe specifically the conduct plaintiff was challenging, the USAir transaction was not mentioned. Moreover, plaintiff has an application pending before the Department of Transportation to permit it to engage in code-sharing and related cooperative prac-

tices with Delta Airlines. *Joint Application of Delta Air Lines, Inc. and Virgin Atlantic Airways, Ltd.,* Doc. No. 49523 (DOT April 22, 1994). Accordingly, British Airways' motion to dismiss all claims growing out of the USAir transaction is granted.

Furthermore, code-sharing by a British airline and an American airline is specifically authorized by Bermuda II. The relevant portion of the treaty provides:

*Any* United Kingdom designated airline may enter into a commercial agreement with *any* US airline or airlines under which that other airline's flights carry the airline designator code of both airlines and may be held out by the designated airline as services to a point in US territory as though those services were its own ...

Bermuda II, Annex 1, § 5, ¶ 11 (emphasis added). Virgin Atlantic argues that this section does not apply because it authorizes only code-sharing that does not violate the antitrust laws. However, this argument ignores the principle that a later law supersedes an earlier one. *See Cook v. United States,* 288 U.S. 102, 118–19, 53 S.Ct. 305, 311–11, 77 L.Ed. 641 (1933) (treaty supersedes earlier enacted statute to the extent they are inconsistent). Virgin Atlantic relies on *Blanco v. United States,* 775 F.2d 53, 61–62 (2d Cir. 1985) to argue that a treaty supersedes an inconsistent prior statute only when there is an express conflict between the two that creates a "positive repugnancy" that prevents a court from "construing the two so as to give effect to both." That is precisely the situation here.

The portion of the complaint that deals with USAir's withdrawal from the transatlantic market must be dismissed because that action was taken pursuant to a final judgment in a suit brought against USAir by the Department of Justice, *United States v. USAir Group, Inc.,* Civ. No. 93–0530, 1993 WL 523459 (D.D.C. Sept. 30, 1993). Compliance with a federal court order cannot be the basis of antitrust liability.

To the extent that there are any parts of British Airways' alliance with USAir that might be actionable apart from the code-sharing and USAir's withdrawal from the

market, those claims are dismissed. Whatever, if anything remains, is a small fraction of plaintiff's claim and under these circumstances it is appropriate to defer to the Department of Transportation which has scrutinized and approved of the entire transaction. *See Hughes Tool Co. v. Trans World Airlines, Inc.,* 409 U.S. 363, 389, 93 S.Ct. 647, 661, 34 L.Ed.2d 577 (1973) (applying deferral doctrine); *Pan American World Airways, Inc. v. United States,* 371 U.S. 296, 83 S.Ct. 476, 9 L.Ed.2d 325 (1963) (same).[2] Moreover, it is doubtful that Virgin Atlantic has standing to challenge a merger between two competitors. *See Cargill, Inc. v. Monfort of Colorado, Inc.,* 479 U.S. 104, 118–20, 107 S.Ct. 484, 493–95, 93 L.Ed.2d 427 (1986). Accordingly, plaintiff's fourth and fifth claims are dismissed.

### D. *Attempted Monopolization*

 Virgin Atlantic's first claim, brought under § 2 of the Sherman Act, alleges that British Airways has attempted to monopolize transatlantic airline passenger service between the United States and the United Kingdom. To state an attempted monopolization claim a plaintiff must plead facts that if true would establish: (1) that the defendant engaged in predatory or anticompetitive conduct, (2) that the defendant acted with specific intent to monopolize, and (3) that there was a dangerous probability that the defendant would succeed in acquiring monopoly power over a particular market. *Spectrum Sports, Inc. v. McQuillan,* —— U.S. ——, —— – ——, 113 S.Ct. 884, 890–92, 122 L.Ed.2d 247 (1993). Plaintiff meets the first two requirements easily and defendant does not dispute that the complaint alleges a variety of anticompetitive conduct and facts that support an inference that defendant acted with the requisite specific intent. The serious issue is whether there is a dangerous probability of British Airways acquiring monopoly power.

 Monopoly power has been defined as the power to control prices or exclude competition. *United States v. Grinnell Corp.,* 384 U.S. 563, 571, 86 S.Ct. 1698, 1704, 16 L.Ed.2d 778 (1966). British Airways argues that Virgin Atlantic cannot, as a matter of law, demonstrate a dangerous probability that British Airways may someday be able to control prices or exclude competition in transatlantic air travel because Bermuda II makes acquisition of monopoly power impossible, and because the market shares attributed to British Airways in the complaint are too small. British Airways correctly notes that "undisputed facts may enable the trial judge to rule on a claim of monopoly power as a matter of law." *Broadway Delivery Corp. v. United Parcel Service, Inc.,* 651 F.2d 122, 129 (2d Cir.), *cert. denied,* 454 U.S. 968, 102 S.Ct. 512, 70 L.Ed.2d 384 (1981). However, such a ruling is only possible once all of the facts have been developed, either on a motion for summary judgment or after trial (as in *Broadway Delivery Corp.*). *See also Frito–Lay, Inc. v. Bachman Co.,* 659 F.Supp. 1129, 1139 (S.D.N.Y.1986) (holding that it would be premature to grant a motion to dismiss a claim of monopolization because whether monopoly power actually exists is a question of fact). Whether monopoly power exists depends on a number of factors including the strength of competition, the probable development of the industry, consumer demand, and the defendant's market share. *Hayden Publishing Co., Inc. v. Cox Broadcasting Corp.,* 730 F.2d 64, 68 (2d Cir.1984); *see also International Distribution Centers, Inc. v. Walsh Trucking Co., Inc.,* 812 F.2d 786, 792 (2d Cir.), *cert. denied,* 482 U.S. 915, 107 S.Ct. 3188, 96 L.Ed.2d 676 (1987) ("market share analysis, while essential, is not necessarily determinative in the calculation of monopoly power"). The effect of government regulation is also a factor to be considered. But on the face of the complaint, it

**2.** While Virgin Atlantic correctly notes that the "public interest" factors considered by the DOT are different from the competitive factors relevant to an antitrust inquiry, the DOT in this case specifically found that transaction will "increase the service options to the traveling and shipping public," *In re USAir and British Airways,* DOT Order 93–3–17 at 9 (March 15, 1993), and found

"no evidence that the wet-leasing agreement between USAir and [British Airways] will reduce competition in the markets involved or be contrary to the antitrust laws." *Id.* at 15. While the DOT findings do not immunize the transaction from antitrust liability, they are entitled to weight in considering whether Virgin Atlantic has stated a claim.

cannot be concluded that all of the relevant factors preclude the acquisition of monopoly power by British Airways. The market share figures pleaded in the complaint which range between 39 percent and 52 percent of potentially relevant markets, may themselves in certain circumstances demonstrate a dangerous probability of acquiring monopoly power. *See Hayden Publishing,* 730 F.2d at 69 n. 7 ("a party may have monopoly power in a particular market even though its market share is less than 50%"). Accordingly, the motion to dismiss Virgin Atlantic's claim of attempted monopolization on the face of the complaint must be denied.

### E. *Monopoly Leveraging*

■■■ There are three elements to a claim of monopoly leveraging: (1) monopoly power in one market, (2) use of that power to foreclose competition or gain a competitive advantage in a distinct market, and (3) injury amounting to a tangible harm to competition. *See Twin Laboratories, Inc. v. Weider Health & Fitness,* 900 F.2d 566, 571 (2d Cir.1990); *Grand Light & Supply Co., Inc. v. Honeywell, Inc.,* 771 F.2d 672, 681 (2d Cir. 1985); *Berkey Photo, Inc. v. Eastman Kodak Co.,* 603 F.2d 263, 275–76 (2d Cir.1979), *cert. denied,* 444 U.S. 1093, 100 S.Ct. 1061, 62 L.Ed.2d 783 (1980). A defendant may be liable for monopoly leveraging even if it has not attempted to monopolize the second market. *Berkey Photo,* 603 F.2d at 276.

■■■ British Airways' argument that monopoly leveraging does not state an independent § 2 offense is without merit. The Second Circuit decisions setting forth the elements of a claim for monopoly leveraging, *Berkey Photo* and *Grand Light & Supply,* remain the law of this circuit. *See Ortho Diagnostic Sys. Inc. v. Abbott Labs., Inc.,* 822 F.Supp. 145, 155 (S.D.N.Y.1993).

The complaint alleges that British Airways has a monopoly at Heathrow and Gatwick. Defendant argues that plaintiff's monopoly leveraging claim must be dismissed because Heathrow and Gatwick are not distinct from the market in which Virgin Atlantic alleges British Airways has used its monopoly to gain an unfair competitive advantage: transatlantic air passenger service. This argument misconstrues the complaint. The complaint alleges that British Airways has monopoly control over Heathrow, Gatwick, and flights from those airports to destinations outside the United States. The complaint alleges that defendant is using those monopolies to gain an advantage in the market for transatlantic service, i.e. air passenger service to and from the United States.[3] This is most clearly illustrated in the section of the complaint alleging that British Airways discriminates against Virgin Atlantic passengers:

> [British Airways] has monopoly power over Heathrow and numerous city-pair and/or airport-pair markets between Europe and Heathrow. Passengers wishing to fly from the United States to Europe may prefer to fly into Heathrow on Virgin and then switch to a [British Airways] flight to their final European destination. [British Airways] has attempted to coerce Virgin passengers into flying their entire trip with [British Airways] by refusing to confirm to Virgin passenger reservations on connecting [British Airways] flights in a timely manner. [British Airways] is exploiting its monopoly power at Heathrow and in certain markets or airline passenger service between Heathrow and European cities to coerce Virgin passengers needing connecting flights out of Heathrow to switch their Virgin tickets to [British Airways].

(Compl. ¶ 111) Similarly, the allegations regarding defendant's corporate travel programs and TACOs depend on the fact that British Airways has a monopoly over routes other than those across the North Atlantic. According to the complaint, British Airways' corporate travel programs and TACOs "are structured to operate across its extensive

---

**3.** Defendant's argument that the antitrust laws are inapplicable to alleged monopolies outside the United States is misplaced. What the complaint alleges is that British Airways has used monopolies abroad to affect commerce in the United States. That is a cognizable claim. *See*

*Hartford Fire Ins. Co. v. California,* — U.S. —, —, 113 S.Ct. 2891, 2909, 125 L.Ed.2d 612 (1993) ("Sherman Act applies to foreign conduct that was meant to produce and did in fact produce some substantial effect in the United States").

global network, rather than on a route by route basis." (Compl. ¶ 114)

■ British Airways also argues that even if Heathrow, Gatwick, and flights to foreign destinations constitute a distinct market, the complaint must be dismissed because its share of those markets is too small. This argument must be rejected as premature. It is true that the market shares pleaded in the complaint, 40 percent of all slots at Heathrow and 31 percent of all slots at Gatwick, are too small by themselves to establish a monopoly. *See Broadway Delivery Corp. v. United Parcel Service, Inc.*, 651 F.2d 122, 129 (2d Cir.), *cert. denied*, 454 U.S. 968, 102 S.Ct. 512, 70 L.Ed.2d 384 (1981); *United States v. Aluminum Co. of America*, 148 F.2d 416, 424 (2d Cir.1945). However, it is not clear that these figures alone should determine whether British Airways does in fact have monopoly power. The complaint describes in detail British Airways' control over airport ground services such as gates, ticket counters, and baggage handling facilities, as well as defendant's extensive network of routes from London to destinations other than in the United States. It cannot be determined on a motion to dismiss the complaint whether Virgin Atlantic can prove that British Airways exercises sufficient control to support a claim of illegal leveraging.

Finally, British Airways argues that Virgin Atlantic does not have standing to bring its § 2 claims because it has not alleged a sufficient "antitrust injury," i.e. an "injury of the type that the antitrust laws were intended to prevent and that flows from that which makes defendant's acts unlawful." *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.*, 429 U.S. 477, 489, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977). Rather, defendant argues, the conduct alleged in the complaint amounts to no more than vigorous competition and is not actionable. This argument must be rejected.

The most straightforward allegation in the complaint is that British Airways discriminates against Virgin Atlantic ticketholders who want to make connections in London. If the allegations in the complaint are true, there would be no legitimate competitive reason for such conduct. Such acts would discourage transatlantic travellers from using

airlines other than British Airways and would be an injury to those consumers, to competition generally, and to plaintiff specifically. The situation is analogous to *Viacom International, Inc. v. Time Inc.*, 785 F.Supp. 371 (S.D.N.Y.1992). In *Viacom*, the parties were competitors in the national market for pay television services. In addition, the defendant had monopolies over certain local cable television markets. The court held that the plaintiff stated a claim for monopoly leveraging by alleging that the defendant refused to carry plaintiff's programming in the local markets where it had a monopoly, thereby distorting competition in the national market for pay television. *Viacom*, 785 F.Supp. at 377–80.

### F. *Restraint of Trade*

■ Virgin Atlantic alleges that British Airways' corporate travel programs and TACOs constitute exclusive dealing arrangements in violation of § 1 of the Sherman Act. As a threshold issue, defendant challenges Virgin Atlantic's standing to raise this claim. British Airways analogizes this case to the substitution of one supplier of services for another, noting that courts have held that a disappointed supplier does not have standing to challenge the action absent some more generalized harm to the market. *See Balaklaw v. Lovell*, 14 F.3d 793, 798–800 (2d Cir. 1994); *Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101, 1109 (7th Cir.1984), *cert. denied*, 470 U.S. 1054, 105 S.Ct. 1758, 84 L.Ed.2d 821 (1985). The complaint in this case, however, does allege generalized harm to the market with the claim that the alleged exclusive dealing arrangements constitute an abuse of British Airways' monopoly power at Heathrow which forecloses competition to the detriment of the competitive process and consumers. (Compl. ¶ 107) This allegation is sufficient to survive a motion to dismiss.

■ Establishing an exclusive dealing claim requires proof of (1) an agreement and (2) an unreasonable restraint of trade or commerce. *International Distribution Centers, Inc. v. Walsh Trucking*, 812 F.2d 786, 793 (2d Cir.), *cert. denied*, 482 U.S. 915, 107 S.Ct. 3188, 96 L.Ed.2d 676 (1987). Defendant argues that plaintiff has not pleaded

sufficient facts to support an inference that any necessary element of a § 1 claim exists. This argument is not persuasive.

The complaint plainly pleads that British Airways' corporate travel programs and TACOs constitute exclusive dealing agreements. (Compl. ¶ 102) Defendant argues that these allegations are insufficient because the complaint does not identify the specific corporations and travel agents with whom it is alleged to have executed illegal agreements. Such specificity is not required when the sources of proof are clearly within the defendant's control. *See Expoconsul International, Inc. v. A/E Systems, Inc.*, 711 F.Supp. 730, 735 (S.D.N.Y.1989) (denying motion to dismiss Sherman Act § 1 claim when evidence of the specific identity of third parties alleged to have conspired with defendant was largely in defendant's hands). Equally premature is the argument that British Airways' loyalty programs do not constitute a "meeting of the mind" between defendant and third parties. Eventually Virgin Atlantic will have to prove that some customers actually agreed to purchase transatlantic airline tickets only from British Airways. But, even at trial such proof may be indirect. *Roland Machinery Co. v. Dresser Industries, Inc.*, 749 F.2d 380, 392 (7th Cir.1984) (plaintiff must prove agreement but not necessarily an explicit one); *Tire Sales Corp. v. Cities Service Oil Co.*, 637 F.2d 467, 474 (7th Cir.1980), *cert. denied*, 451 U.S. 920, 101 S.Ct. 1999, 68 L.Ed.2d 312 (1981) (agreements may be inferred from circumstances surrounding course of dealing); *Dillon Materials Handling, Inc. v. Albion Industries, Div. of King–Seeley Thermos Co.*, 567 F.2d 1299, 1302 (5th Cir.), *cert. denied*, 439 U.S. 832, 99 S.Ct. 111, 58 L.Ed.2d 127 (1978) (even in the absence of an express exclusivity requirement "an antitrust plaintiff is not foreclosed from making out a case"). Accordingly, this claim cannot be dismissed on the face of the complaint.

█ The same reasoning applies to defendant's argument that plaintiff will be unable to show, as required by *Tampa Electric Co. v. Nashville Coal Co.*, 365 U.S. 320, 327, 81 S.Ct. 623, 627, 5 L.Ed.2d 580 (1961), that British Airways' loyalty programs "foreclose competition in a substantial share of the line of commerce affected." This is a uniquely factual inquiry, and the finder of fact must consider "the relative strength of the parties, the proportionate volume of commerce involved in relation to the total volume of commerce in the relevant market area, and the probable immediate and future effects which pre-emption of that share of the market might have on effective competition therein." *Tampa Electric*, 365 U.S. at 329, 81 S.Ct. at 629. Evaluating all of these factors requires a factual inquiry that is inappropriate on the face of the complaint. Accordingly, defendant's motion to dismiss Virgin Atlantic's claim of exclusive dealing under § 1 of the Sherman Act must be denied.

### G. *Common Law Claims*

█ Virgin Atlantic's common law claims are preempted by federal law and are dismissed. Section 1305(a)(1) of the Airline Deregulation Act of 1978, 49 U.S.C.App. § 1305(a)(1), expressly prohibits states from "enact[ing] or enforc[ing] any law, rule, regulation, standard, or other provision having the force and effect of law relating to rates, routes, or services of any air carrier ..." In *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, ——, 112 S.Ct. 2031, 2037, 119 L.Ed.2d 157 (1992) the Supreme Court held that the statute is to be read expansively and that the language preempts all actions having a "connection with or reference to airline 'rates, routes or services,'" unless that relationship is "too tenuous, remote, or peripheral." 504 U.S. at ——, 112 S.Ct. at 2040, 119 L.Ed.2d at 171–72. The Court applied this rule to strike down state regulation of airline fare advertising.

The theory underlying plaintiff's common law claims is that defendant has used sharp practices to lure away customers. That is within the broad meaning of "rates, routes or services" and the facts here are analogous to those in two other cases in which courts have ruled that state law claims were preempted. In *Continental Airlines, Inc. v. American Airlines, Inc.*, 824 F.Supp. 689 (S.D.Tex. 1993), Continental challenged American's "Value Pricing plan," a system of reduced ticket prices. Continental alleged federal an-

titrust claims and state-law claims for tortious interference with business relations and unfair competition. The court dismissed the tort claims as preempted by the Airline Deregulation Act. *Continental*, 824 F.Supp. at 697. Similarly, in *Frontier Airlines, Inc. v. United Air Lines, Inc.*, 758 F.Supp. 1399 (D.Colo.1989), Frontier challenged United's use of its computer reservation system and its dealings with travel agents. It alleged claims under the Colorado Antitrust statue and the Colorado Unfair Practices Act as well as common law claims for unfair business practices and tortious interference with contracts and prospective contractual relations. The court held that all of Frontier's state law claims were preempted. *Frontier*, 758 F.Supp. at 1411.

Three of the cases plaintiff cites are clearly distinguishable. *Butcher v. City of Houston*, 813 F.Supp. 515 (S.D.Tex.1993) dealt with a slip and fall in an airport. *Seidman v. American Airlines, Inc.*, 923 F.2d 1134 (5th Cir.1991) was also a personal injury action; it concerned a passenger injured on an airplane's emergency slide. *Levy v. American Airlines, Inc.*, No. 90 Civ. 7005 (LJF), 1993 WL 205857, (S.D.N.Y. June 9, 1993), considered whether an airline was liable for injuries allegedly suffered by a prisoner in a scuffle with law enforcement officers.

In *Wolens v. American Airlines, Inc.*, 157 Ill.2d 466, 626 N.E.2d 205, 193 Ill.Dec. 172 (1993), *cert. granted,* — U.S. ——, 114 S.Ct. 1396, 128 L.Ed.2d 69 (1994), on which plaintiff also relies, the Illinois Supreme Court considered whether § 1305 preempted a state law damages action for breach of contract against an airline which made unilateral retroactive changes in its frequent flier program. On remand from the Supreme Court for further consideration in light of *Morales*, the Illinois Supreme Court held that frequent flier programs were "peripheral to the operation of an airline," and that thus, state law claims for money damages "bear only a tangential, or tenuous, relation to American's rates, routes, and services" and were not preempted by § 1305. 157 Ill.2d at 473, 193 Ill.Dec. at 175, 626 N.E.2d at 208. The Supreme Court has again granted certiorari and will consider the case this term. 114 S.Ct. 1396 (1994).

Virgin Atlantic's state law claims—which are based on the same facts as those alleged in its federal antitrust claims—are much more like those in *Continental* and *Frontier* than those in *Butcher, Seidman,* or *Levy.* Under the Supreme Court's expansive reading of § 1305 in *Morales,* the conduct alleged by Virgin Atlantic clearly "relates" to the "rates, routes, and services" of British Airways. Therefore, the state law claims are preempted.

### Conclusion

For the foregoing reasons, British Airways' motion to dismiss the complaint is denied with respect to Virgin Atlantic's first, second, and third claims for relief, and granted with respect to the remaining five claims in the complaint.

SO ORDERED.