**A.I.B. EXPRESS, INC., Plaintiffs,**

v.

**FEDEX CORP. and Federal Express Corp., Defendants.**

**No. 03 Civ.8087 SAS.**

United States District Court,
S.D. New York.

Nov. 8, 2004.

---

Jerry S. Goldman, Gina M. MacNeill, Law Offices of Jerry S. Goldman, P.C., New York, NY, for Plaintiffs.

Justin M. Ross, Federal Express Corporation, Litigation Department, Memphis, TN, Olivia M. Gross, Newman, Fitch, Altheim & Myers, New York, NY, for Defendants.

## OPINION AND ORDER

SCHEINDLIN, District Judge.

### I. INTRODUCTION

A.I.B. Express, Inc. ("AIB") is suing Federal Express Corporation and its parent, FedEx Corporation (collectively, "FedEx"), alleging federal antitrust claims as well as state law claims for misappropria-

tion of trade secrets, unfair competition, breach of the implied covenant of good faith and fair dealing, and tortious interference with business relations and contractual relations. FedEx now moves for judgment on the pleadings under Federal Rule of Civil Procedure 12(c).

## II. FACTS

AIB alleges the following facts. AIB is a New York corporation engaged in the business of facilitating the transportation of gems and jewelry, primarily for merchants in the New York Diamond District.[1] At the time it filed its complaint, AIB provided two primary services (hereinafter, "facilitation services"). *First*, AIB picked up from its customers' places of business packages containing gemstones and/or jewelry that were intended to be shipped overnight to locations throughout the United States.[2] AIB employed armed couriers to transport these packages to Kennedy airport or other FedEx distribution centers, whereupon the packages were shipped to their ultimate destinations using AIB's FedEx account.[3] *Second*, AIB offered its customers insurance against the loss of their shipments.[4] AIB billed the majority of its customers an aggregate price, reflecting both transportation and insurance costs.[5]

AIB started a business relationship with FedEx sometime in 1998.[6] On August 11, 1999, the parties entered into a written agreement.[7] Under the terms of the agreement, AIB received a discount on FedEx transportation charges.[8] The agreement also provided that either party could terminate the agreement upon thirty days written notice.[9] Until the filing of its complaint, AIB used FedEx as its sole shipper, in part because many jewelry insurers required that AIB use FedEx.[10] AIB alleges that FedEx's share of the market for the time-sensitive transportation of jewelry valued under $75,000 was in excess of 70%.[11]

While the agreement was in force, AIB's customers had the option of creating FedEx shipping labels containing AIB's account information at their own places of business.[12] Packages labeled in this manner bore no external indication that they contained jewelry or were being shipped to or from a jeweler; the true contents of the package were concealed from everyone, including FedEx employees.[13] This practice was a convenience not only for AIB's customers, but even more significantly for AIB itself, which thus avoided the burden of generating hundreds of shipping labels every day on its own premises.[14]

By plaintiff's account, this business mod-

---

1. *See* AIB's Verified Complaint ¶¶ 8–9 ("Compl.").

2. *See id.* ¶ 35.

3. *See id.*

4. *See id.*

5. *See id.* ¶ 48.

6. *See id.* ¶ 36.

7. *See id.* ¶ 34; FedEx Standard Pricing Program: Terms and Conditions ("Pricing Agr.").

8. *See* Compl. ¶ 45.

9. *See* Pricing Agr. ¶ 8.

10. *See* Compl. ¶¶ 57–58.

11. *See id.* ¶ 133.

12. *See id.* ¶ 35.

13. *See id.*

14. *See id.* ¶¶ 62, 100.

el proved successful.[15] Over the course of approximately five and a half years, AIB built up its business in the Diamond District, to the point where AIB handled roughly 175,000 packages a year.[16] In early 2002, FedEx introduced a service, which it called "Declared Value Exception" ("DVX"), to provide secure pick-up of high-value packages in direct competition with AIB.[17] While DVX provides some coverage against loss, the level of coverage is not the same as the all-risk insurance provided by AIB.[18] FedEx made no significant inroads into AIB's market, however, even after reducing prices for its DVX service to a level competitive with those charged by AIB.[19]

In mid-September, 2003, FedEx provided AIB written notice of its intention to terminate the pricing agreement between the parties as of October 20, 2003—immediately prior to the holiday shipping season.[20] FedEx advised that it was willing to enter into a new arrangement with AIB, but with two crucial differences that cut to the heart of AIB's business model.[21] *First*, AIB would no longer enjoy a discounted shipping rate as under the old pricing agreement; the new rate represented a 70% increase.[22] *Second*, AIB's customers could no longer use AIB's account when preparing shipping labels at their places of business.[23] Instead, AIB

would be required to create labels on its own premises. AIB alleges that these changes in its relationship with FedEx will effectively destroy the business model AIB established over the course of five years.[24]

At the same time it terminated the pricing agreement, FedEx began contacting AIB's customers directly in an effort to convince them to switch to the DVX service.[25] In so doing, FedEx allegedly made use of confidential information obtained from AIB concerning AIB's customers and their shipping practices.[26] FedEx offered these customers a greater shipping discount than it offered AIB, even though FedEx itself would have to provide an armed courier to pick up their packages.[27] In addition, FedEx allowed AIB's customers the convenience of printing labels at their own places of business.[28]

AIB alleges that its customers as well as the customers of similar businesses whose contracts with FedEx were also cancelled will be forced to use the DVX service.[29] AIB predicts that it will be driven out of business, along with other jewelry transportation facilitators.[30]

## III. APPLICABLE LAW

### A. Legal Standard

In deciding a motion for judgment on the pleadings under Rule 12(c), the court

---

15. *See id.* ¶¶ 43, 73–74.

16. *See id.* ¶ 42.

17. *See id.* ¶¶ 80–81.

18. *See id.* ¶ 134.

19. *See id.* ¶¶ 91–95.

20. *See id.* ¶ 97.

21. *See id.* ¶ 98.

22. *See id.* ¶¶ 102, 113.

23. *See id.* ¶ 99.

24. *See id.* ¶¶ 100, 115, 119.

25. *See id.* ¶ 103.

26. *See id.* ¶ 104.

27. *See id.* ¶ 105.

28. *See id.*

29. *See id.* ¶¶ 106–07, 117, 125, 141.

30. *See id.* ¶ 125.

applies "the same standard as that applicable to a motion under Rule 12(b)(6)." [31] The movant bears a heavy burden since pleading a claim under the Federal Rules is remarkably easy. Unless a claim falls into one of the exceptions set forth in Rule 9, a plaintiff need provide nothing more than "a short and plain statement of the claim showing that the pleader is entitled to relief." [32] The long-standing rule in appraising a complaint's sufficiency is that a claim should not be dismissed "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." [33] Put another way, the task of a federal court in reviewing the sufficiency of a complaint prior to the receipt of any evidence is a narrow one. "The fundamental issue at the dismissal stage 'is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims. Indeed it may appear on the face of the pleading that a recovery is very remote and unlikely but that is not the test.' " [34]

When deciding a motion to dismiss, a court must accept all factual allegations in the complaint as true, and draw all reasonable inferences in plaintiff's favor. [35] The court may not consider matters outside the pleadings, but may consider documents attached to the pleadings, documents referenced in the pleadings, or documents that are integral to the pleadings. [36]

"No heightened pleading requirements apply in antitrust cases." [37] Moreover, dismissals in antitrust cases "prior to giving the plaintiff ample opportunity for discovery should be granted very sparingly." [38] "Nonetheless, '[i]t is not ... proper to assume that the [plaintiff] can prove facts that it has not alleged or that the defendants have violated the antitrust laws in ways that have not been alleged.' " [39]

## B. Federal Claims

### 1. Standing

■ To plead an antitrust action, a plaintiff must first allege standing to bring suit. The Second Circuit has provided a two-prong test for determining whether a plaintiff has antitrust standing. "[C]ourts must [first] determine whether the plaintiff suffered an antitrust injury." [40] If that prong is satisfied, the court must next "determine whether any of the other factors, largely relating to the directness and identifiability of the plaintiff's injury, pre-

---

31. *Ziemba v. Wezner*, 366 F.3d 161, 163 (2d Cir.2004) (quotation omitted).

32. *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 512, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002) (quoting Fed.R.Civ.P. 8(a)(2)).

33. *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957).

34. *Phelps v. Kapnolas*, 308 F.3d 180, 184–85 (2d Cir.2002) (quoting *Chance v. Armstrong*, 143 F.3d 698, 701 (2d Cir.1998)). *See also Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974).

35. *Ziemba*, 366 F.3d at 163.

36. *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir.2002).

37. *Todd v. Exxon Corp.*, 275 F.3d 191, 198 (2d Cir.2001).

38. *Hospital Bldg. Co. v. Trustees of Rex Hosp.*, 425 U.S. 738, 746, 96 S.Ct. 1848, 48 L.Ed.2d 338 (1976).

39. *George Haug v. Rolls Royce Motor Cars*, 148 F.3d 136, 139 (2d Cir.1998) (quoting *Associated Gen. Contractors of Cal., Inc. v. California State Council of Carpenters*, 459 U.S. 519, 526, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983)).

40. *Balaklaw v. Lovell*, 14 F.3d 793, 797 n. 9 (2d Cir.1994).

vent the plaintiff from being an efficient enforcer of the antitrust laws." [41]

### a. Antitrust Injury

■ An antitrust injury is an "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." [42] "The injury should reflect the anticompetitive effect either of the violation or of the anticompetitive acts made possible by the violation." [43] Because the purpose of the antitrust laws is to protect competition, not competitors, "[a]n antitrust plaintiff must allege not only cognizable harm to [himself], but an adverse effect on competition market-wide." [44]

### b. Suitability of Plaintiff

To aid in determining whether a plaintiff is an "efficient enforcer" of the antitrust laws, the Second Circuit has offered a non-exhaustive list of factors to examine:

(1) the directness or indirectness of the asserted injury; (2) the existence of an identifiable class of persons whose self-interest would normally motivate them to vindicate the public interest in antitrust enforcement; (3) the speculativeness of the alleged injury; and (4) the difficulty of identifying damages and apportioning them among direct and indi-

rect victims so as to avoid duplicative recoveries. [45]

### 2. Monopolization

■ In order to state a claim for monopolization, a plaintiff must establish: "(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." [46] The Supreme Court recently provided a helpful gloss on the second element: "the possession of monopoly power will not be found unlawful unless it is accompanied by an element of anticompetitive conduct." [47]

### 3. Attempted Monopolization

■ In order to state an attempted monopolization claim, a plaintiff must establish: "(1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power." [48]

### 4. Monopoly Leveraging

■ After the Supreme Court's recent decision in *Verizon v. Trinko*,[49] a claim of monopoly leveraging now requires that defendant (1) possessed monopoly power in

---

41. *Id.*

42. *Atlantic Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 344, 110 S.Ct. 1884, 109 L.Ed.2d 333 (1990).

43. *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.*, 429 U.S. 477, 489, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977).

44. *Todd,* 275 F.3d at 213.

45. *Volvo N. Am. Corp. v. Men's Int'l Prof'l Tennis Council,* 857 F.2d 55, 66 (2d Cir.1988) (quotations omitted).

46. *Pepsico, Inc. v. Coca–Cola Co.,* 315 F.3d 101, 105 (2d Cir.2002) (quoting *United States v. Grinnell Corp.,* 384 U.S. 563, 570–71, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966)).

47. *Verizon Communications, Inc. v. Law Offices of Curtis V. Trinko, LLP,* 540 U.S. 398, 124 S.Ct. 872, 879, 157 L.Ed.2d 823 (2004).

48. *Pepsico,* 315 F.3d at 105 (quoting *Spectrum Sports, Inc. v. McQuillan,* 506 U.S. 447, 456, 113 S.Ct. 884, 122 L.Ed.2d 247 (1993)).

49. 540 U.S. 398, 124 S.Ct. 872, 157 L.Ed.2d 823.

one market; (2) used that power to create a dangerous probability of monopolizing another market; and (3) caused injury by such anticompetitive conduct.[50]

## C. Federal Preemption of State Law Claims

The Airline Deregulation Act ("ADA") provides that "a State ... may not enact or enforce a law, regulation, or other provision having the force and effect of law related to a price, route, or service of an air carrier."[51] While the Supreme Court has read this language broadly,[52] it has also noted that "[s]ome state actions may affect [rates] in too tenuous, remote, or peripheral a manner to have preemptive effect."[53] Finding that "[t]he 'related to'

language of the ADA provides neither a predictable nor practical formula for distinguishing preempted from non-preempted state and local laws,"[54] the Second Circuit has offered additional guidance. " 'Related to' appears ... to mean whether state law actually 'interferes' with the purposes of the federal statute, in this case airline deregulation."[55]

## IV. DISCUSSION [56]

### A. AIB's Antitrust Claims

### 1. Standing

### a. Antitrust Injury

■ FedEx contends that AIB fails to meet the antitrust injury requirement be-

---

**50.** *See id.* at 883 n. 4 (holding that the Second Circuit's monopoly leveraging standard was erroneous to the extent that it "dispensed with a requirement that there be a 'dangerous probability of success' in monopolizing a second market.") (quoting *Spectrum Sports,* 506 U.S. at 459, 113 S.Ct. 884). *Cf. New York Mercantile Exch., Inc. v. Intercontinental Exch., Inc.,* 323 F.Supp.2d 559, 572 (S.D.N.Y. 2004) ("The standard in the Second Circuit for a monopoly leveraging claim has been that the plaintiff must establish that the defendant (1) possessed monopoly power in one market; (2) used that power to gain a competitive advantage ... in another market; and (3) caused injury by such competitive conduct.") (quotation omitted).

**51.** 49 U.S.C. § 41713(b)(1). FedEx falls within the definition of "air carrier" for the purpose of the ADA. *See, e.g., Federal Express Corp. v. California Public Utils. Comm'n,* 936 F.2d 1075, 1076–77 (9th Cir.1991) (finding that Federal Express is an "air carrier" under the Federal Aviation Act as well as the ADA).

**52.** *See Morales v. Trans World Airlines,* 504 U.S. 374, 384, 112 S.Ct. 2031, 119 L.Ed.2d 157 (1992) (defining the "relating to" language in the ADA preemption clause as "having a connection with or reference to airline 'rates, routes, or services' ").

**53.** *Id.* at 390, 112 S.Ct. 2031 (quotation omitted).

**54.** *Abdu–Brisson v. Delta Airlines, Inc.,* 128 F.3d 77, 82 (2d Cir.1997).

**55.** *Id.*

**56.** As an initial matter, I note AIB's argument that the motion to dismiss should be rejected because of FedEx's failure to abide by my Individual Rules and Procedures. *See* Plaintiff's Memorandum of Law in Opposition to the Defendants' Renewed Motion for a Judgment on the Pleadings at 1–2 ("AIB Mem."). Because parties are expected to be familiar with these rules, defendants are reminded that the rules are available on this Court's website. *See* Individual Rules and Procedures, http://www.nysd.uscourts.gov/Individual_Practices/Scheindlin.pdf. The rules clearly state that, prior to bringing a motion to dismiss, "the parties must exchange letters" and "must certify that pre-motion letters were exchanged." *See id.* at 3–4 (emphasis omitted). "The parties should attempt to eliminate the need for these motions based on this exchange of letters," while recognizing that leave to amend will be freely granted. *Id.* at 3. Although FedEx might have avoided the need for this motion, at least in part, had it followed my Individual Rules, I shall nevertheless address the merits of the motion.

cause its allegations regarding effects on competition are "conclusory." [57] FedEx's argument is unavailing, however, especially in light of the Supreme Court's reminder in *Swierkiewicz v. Sorema* that Rule 8 does not require a plaintiff to plead the facts supporting its allegations with particularity.[58] Drawing all reasonable inferences in AIB's favor, I am satisfied that AIB has adequately pled antitrust injury. The complaint alleges that FedEx terminated long-standing agreements not only with AIB, but also with other companies providing facilitation services in an effort to eliminate these companies as competitors.[59] Moreover, AIB alleges that jewelry merchants face the prospect of being forced to purchase FedEx's inferior DVX product as well as paying higher prices once competition is eliminated in the market for providing facilitation services.[60] That the alleged injury is prospective does not undermine plaintiff's standing at the pleadings stage. "[C]ompetitors may be able to prove antitrust injury before they actually are driven from the market and competition is thereby lessened." [61] I find, therefore, that the alleged injury is of the type the antitrust laws were intended to prevent and flows from FedEx's allegedly unlawful behavior.

### b. Suitability of Plaintiff

█ AIB satisfies the second prong of the standing requirement, as well. A balancing of the four factors listed in *Volvo* favors the conclusion that AIB is an "efficient enforcer" of the antitrust laws. *First,* as a competitor in the facilitation market, AIB is a direct victim of FedEx's alleged violation of the Sherman Act.[62] *Second,* while consumers of AIB's and other companies' facilitation services might arguably be more motivated than AIB to vindicate the public interest in deterring monopolization of the facilitation market, such a conjecture assumes that the increased costs to consumers caused by monopoly pricing will be great enough to persuade one or more of them to undertake an expensive lawsuit. *Third,* although AIB alleges a prospective injury to its business, this injury is not speculative, at least for the purposes of pleading. AIB has alleged that it established a large volume of business,[63] which would provide a baseline against which to measure a damage determination.[64] *Fourth,* there is no indication at this point of a risk of duplicative recoveries. Thus, while the second factor is effectively neutral, the other three lean to varying degrees in AIB's favor. AIB is therefore a proper antitrust plaintiff.

---

57. Defendants' Memorandum in Support of Their Motion for Judgment on the Pleadings ("FedEx Mem.") at 6

58. *See* 534 U.S. 506, 513–15, 122 S.Ct. 992, 152 L.Ed.2d 1.

59. *See* Compl. ¶ 125.

60. *See id.* ¶¶ 137, 147, 149.

61. *Blue Shield of Va. v. McCready*, 457 U.S. 465, 482, 102 S.Ct. 2540, 73 L.Ed.2d 149 (1982).

62. *See Serfecz v. Jewel Food Stores, Inc.*, 67 F.3d 591, 598 (7th Cir.1995) (holding that while hypothetical antitrust injuries suffered by competing grocery stores as well as by consumers would be sufficiently direct to make such parties proper plaintiffs to maintain an action with respect to alleged anticompetitive activities in the retail grocery market, suppliers of rental space to grocery retailers are not proper plaintiffs).

63. *See* Compl. ¶¶ 55.

64. *Cf. ACT, Inc. v. Sylvan Learning Sys., Inc.*, 104 F.Supp.2d 1096 (N.D.Iowa 1999) (denying motion for summary judgment on antitrust damages because plaintiff's history of profitability would provide a reasonable basis for determining lost prospective profits).

## 2. Monopolization

■ AIB's first claim alleges monopolization in violation of the Sherman Act. As an initial matter, it is necessary to define the market or markets FedEx is accused of monopolizing.[65] AIB alleges the existence of two relevant product and geographic markets. *First,* the complaint identifies a market for the time-sensitive transportation of jewelry valued under $75,000 within the United States (the "transportation market").[66] *Second,* the complaint identifies a market for facilitating the shipment of jewelry within the United States (the "facilitation market").[67] Although AIB further identifies in its opposition memorandum a geographic submarket of the national facilitation market, namely a New York facilitation market,[68] AIB does not plead the existence of this submarket in its complaint.

■ AIB has failed to state a claim of monopolization. AIB alleges that FedEx possesses monopoly power only in the transportation market,[69] but the complaint does not plead that FedEx willfully acquired or maintained its monopoly power in that market. The "willful acquisition or maintenance" of monopoly power refers to anticompetitive conduct.[70] Although AIB asserts that FedEx's actions have suppressed competition in the transportation market,[71] the facts alleged in the complaint do not logically support this conclusion. AIB competes only in the facilitation market, not the transportation market. Therefore, AIB's allegations that FedEx's actions threaten to destroy AIB's business lend no support to a conclusion that competition in the transportation market is thereby reduced. Put another way, the anticompetitive conduct alleged by AIB is not relevant to the market FedEx is accused of monopolizing. AIB thus fails to provide FedEx any notice of how it willfully acquired or maintained monopoly power in the transportation market. "[I]t is axiomatic that 'conclusory allegations which merely recite the litany of antitrust' will not suffice."[72] AIB's allegations of unlawful monopolization of the transportation market are just such conclusions and consequently fail to state a claim under the Sherman Act.

**65.** *See Pepsico,* 315 F.3d at 105.

**66.** *See* Compl. ¶ 133.

**67.** *See id.* ¶ 127. In its memorandum opposing FedEx's motion to dismiss, AIB also identifies a market for the insurance of jewelry shipments within the United States, which AIB distinguishes from the facilitation market. *See* AIB Mem. at 11. For a number of reasons, I conclude that this is not a relevant market for the purposes of this motion. *First,* it does not appear that AIB actually pleads the existence of such a market. *Second,* because AIB alleges that FedEx offers its customers a "declared value exception," rather than insurance, an insurance market separate from the facilitation market is irrelevant to FedEx's alleged violation of the Sherman Act. While providing insurance or insurance-like services may be an aspect of the facilitation market, there are no allegations suggesting that FedEx is competing in an *insurance* market.

**68.** *See* AIB Mem. at 11–12.

**69.** AIB estimates that FedEx's share of the transportation market is over 70%. *See* Compl. ¶ 133. The Second Circuit has held that a market share of over 70% is usually "strong evidence" of monopoly power. *Tops Mkts., Inc. v. Quality Mkts., Inc.,* 142 F.3d 90, 99 (2d Cir.1998).

**70.** *See Verizon,* 124 S.Ct. at 879.

**71.** *See* Compl. ¶ 136.

**72.** *Yankees Entm't and Sports Network v. Cablevision Sys. Corp.,* 224 F.Supp.2d 657, 665 (S.D.N.Y.2002) (quoting *John's Insulation, Inc. v. Siska Constr. Co.,* 774 F.Supp. 156, 163 (S.D.N.Y.1991)).

In the alternative, AIB's monopolization claim fails for lack of standing. AIB's alleged injury, the destruction of its business model, does not flow from FedEx's monopolization of the transportation market. On the contrary, the injury is the result of FedEx's terminating the pricing agreement, conduct that AIB alleges was aimed at the domination of the facilitation market.[73] Based on the allegations of the complaint, AIB therefore lacks standing to assert a claim of monopolization of the transportation market.

### 3. Attempted Monopolization

██ AIB's second claim alleges attempted monopolization of "the United States market for the overnight delivery of packages."[74] AIB fails to state a claim of attempted monopolization. Even read in the light most favorable to plaintiff, the complaint does not give rise to an inference that FedEx's actions towards AIB contribute to a "dangerous probability" of FedEx's achieving monopoly power in the United States market for the overnight delivery of packages. As discussed earlier, AIB does not compete in an overnight delivery market, but rather in the facilitation market. The alleged harm to AIB's business would not, therefore, enhance FedEx's position in the overnight delivery market. AIB's attempted monopolization claim is therefore dismissed.

### 4. Monopoly Leveraging

██ AIB offers an alternative theory of monopolization: FedEx leveraged its power in the transportation market to take over the facilitation market. FedEx argues that the Supreme Court's decision in *Verizon v. Trinko* dictates that AIB cannot prove that FedEx engaged in anticompetitive conduct,[75] which is a necessary element of a monopoly leveraging claim.[76] I disagree. *Verizon* states that "[u]nder certain circumstances, a refusal to cooperate with rivals can constitute anticompetitive conduct and violate § 2."[77] The Supreme Court emphasizes, however, that these circumstances are limited and characterizes its leading refusal-to-deal decision, *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.,*[78] as being "at or near the outer boundary of § 2 liability."[79] Despite FedEx's assertions to the contrary, the facts alleged by AIB are sufficiently similar to the facts the Supreme Court considered determinative in *Aspen Skiing* for AIB's allegation of anticompetive conduct to survive a motion to dismiss.

In *Verizon,* the Supreme Court calls attention to two aspects of the defendant's conduct in *Aspen Skiing* that supported a finding of liability in that case. *First,* "[t]he unilateral termination of a voluntary *(and thus presumably profitable )* course of dealing suggested a willingness to forsake short-term profits to achieve an anticompetitive end."[80] *Second,* "the defendant's unwillingness to renew the [previous course of dealing] *even if compensated at retail price* revealed a distinctly anticompetitive bent."[81] Although FedEx asserts

---

73. *See, e.g.,* Compl. ¶ 139.

74. *Id.* ¶ 154.

75. *See* FedEx Mem. at 7–11.

76. *See Verizon,* 124 S.Ct. at 883 n. 4 ("[L]everaging presupposes anticompetitive conduct.").

77. 124 S.Ct. at 879.

78. 472 U.S. 585, 105 S.Ct. 2847, 86 L.Ed.2d 467 (1985).

79. *Id.*

80. *Id.* at 880.

81. *Id.*

in its answer that its relationship with AIB was not profitable,[82] I must accept AIB's allegations as true and draw all reasonable inferences in AIB's favor. AIB alleges that in the year in which FedEx terminated the pricing agreement, the relationship would have generated approximately two million dollars in revenues for FedEx.[83] On this basis, it is reasonable to infer that the course of dealing between the parties was profitable to FedEx and, thus, the decision to terminate revealed an anticompetitive bent. Similarly, although FedEx asserts that its new offer merely reduced AIB's discount to a level commensurate with the cost savings enjoyed by FedEx,[84] AIB alleges that FedEx offered a lower price to jewelers themselves than it did to facilitators like AIB.[85] Again, it would be reasonable to infer from this allegation that FedEx sought to achieve an anticompetitive end. Therefore, the allegations of AIB's complaint fall within the boundary set by *Aspen Skiing* for section 2 liability.[86]

Having alleged anticompetitive conduct, AIB succeeds in stating a monopoly leveraging claim. Accepting the truth of the allegations in the complaint, as I must, I conclude that FedEx has monopoly power in the transportation market, has used that power to break into the facilitation market by refusing to cooperate with AIB, and has thereby injured AIB's business. AIB also sufficiently alleges a dangerous probability that FedEx will monopolize the facilitation market. In keeping with the Rule 8 pleading standard, AIB need not plead specific facts to support this allegation; it is enough at this stage that AIB has alleged that FedEx "will simply take over" the facilitation market.[87] Thus, AIB has pled all the elements of a monopoly leveraging claim.

## B. AIB's State Law Claims

FedEx argues that AIB's state law claims are preempted by the ADA.[88] I agree and, therefore, conclude that all of AIB's state law claims—misappropriation of trade secrets, unfair competition, breach of the implied covenant of good faith and fair dealing, and tortious interference with business relations and contractual relations—must be dismissed.[89]

---

82. *See* Federal Express Corporation's Answer and Affirmative Defenses ("Answer") at 4.

83. *See* Compl. ¶ 75.

84. *See* Answer at 5.

85. *See* Compl. ¶ 105.

86. Plaintiff's attempt to analogize AIB's allegations to the plaintiff's allegations in *Verizon* is unconvincing. *See* FedEx Mem. at 10–11. The Supreme Court noted in *Verizon* that the complaint did not allege that defendant ever "engaged in a course of dealing with its rivals, or would ever have done so absent statutory compulsion." 124 S.Ct. at 880. In addition, the services that plaintiff alleged Verizon withheld were "not otherwise marketed or available to the public." *Id.* By contrast, AIB alleges a five-year-long course of dealing as well as a refusal by FedEx to offer terms as favorable as those it extended to its retail customers.

87. Compl. ¶ 138.

88. *See* FedEx Mem. at 14–27.

89. Because I have concluded the state law claims are preempted, the issue of whether AIB's demand for punitive damages is preempted is moot. Nonetheless, it should be noted that FedEx's argument that all such demands are automatically preempted is incorrect. *See* FedEx Mem. at 25–26. There is authority in this very District, which FedEx neglects to cite in its brief, holding that preemption of a demand for punitive damages is not warranted where the underlying tort claim does not relate to the provision of airline services. *See Peterson v. Continental Airlines, Inc.,* 970 F.Supp. 246, 252 (S.D.N.Y. 1997).

### 1. Misappropriation of Trade Secrets

"To succeed on a claim for the misappropriation of trade secrets under New York law, a party must demonstrate: (1) that it possessed a trade secret, and (2) that the defendants used that trade secret in breach of an agreement, confidential relationship or duty, or as a result of discovery by improper means."[90] Based on the facts alleged by AIB, this claim is preempted. The complaint alleges that when preparing a shipping label, AIB or its customer disclosed to FedEx certain information, including the customer's name and address, the weight and size of the package, the date of the shipment, and the package's final destination.[91] The complaint further alleges that this information was disclosed "so that [FedEx] may properly ship the package."[92] A finding of liability on these facts[93] would interfere with the purpose of the ADA because the manner in which air carriers such as FedEx receive their shipping information would hereafter fall within the purview of state law. AIB's misappropriation of trade secrets claim thus relates to FedEx's services and is preempted.

### 2. Unfair Competition

AIB's fourth claim, alleging unfair competition, is also preempted by the ADA. "[T]he gravamen of a claim of unfair competition is the bad faith misappropriation of a commercial advantage belonging to another ... by exploitation of proprietary information or trade secrets."[94] AIB's unfair competition claim thus concerns the same alleged trade secrets as AIB's misappropriation claim. The result of the preemption analysis is, therefore, the same as well: insofar as it concerns information disclosed so that FedEx could ship packages, AIB's unfair competition claim relates to the services of an air carrier and is preempted.[95]

---

90. *North Atl. Instruments, Inc. v. Haber*, 188 F.3d 38, 43–44 (2d Cir.1999).

91. *See* Compl. ¶¶ 50, 52.

92. *Id.* ¶ 51.

93. In any event, it is highly unlikely that AIB could prove that this information is a trade secret. Addressing what constitutes a trade secret, the Court of Appeals of New York cites with approval the following list of factors from the Restatement of Torts:
 (1) the extent to which the information is known outside of [the] business; (2) the extent to which it is known by employees and others involved in [the] business; (3) the extent of measures taken by [the business] to guard the secrecy of the information; (4) the value of the information to [the business] and [its] competitors; (5) the amount of effort or money expended by [the business] in developing the information; (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.
 *Ashland Mgmt. Inc. v. Janien*, 82 N.Y.2d 395, 407, 604 N.Y.S.2d 912, 624 N.E.2d 1007 (1993) (quoting Restatement of Torts § 757 cmt. b (1939)). "As these considerations demonstrate, a trade secret must first of all be secret." *Id.* While acknowledging that secrecy is generally a question of fact, *see id.*, I note that AIB's contention that the basic shipping information provided to FedEx constitutes a trade secret is a thin reed on which to base a misappropriation claim.

94. *Eagle Comtronics, Inc. v. Pico Prods., Inc.*, 256 A.D.2d 1202, 682 N.Y.S.2d 505, 506 (1998).

95. *See In re EVIC Class Action Litig.*, No. M–21–84 *et al.*, 2002 WL 1766554 at *8 (S.D.N.Y. July 31, 2002) (holding that unfair competition claim is preempted by statute mirroring ADA because the subject matter of the suit—United Parcel Service's "excess value insurance" program—is related to price and service); *Virgin Atl. Airways Ltd. v. British Airways PLC*, 872 F.Supp. 52, 66 (S.D.N.Y.1994) (holding that ADA preempts common law claims, including unfair competition claim, because plaintiff's underlying theory "that defendant ... used sharp practices to lure away customers [is] within the broad meaning of 'rates, routes or services' ").

### 3. Breach of Implied Covenant of Good Faith and Fair Dealing

 In its fifth claim, AIB alleges that FedEx's termination of the pricing agreement breached an implied covenant of good faith and fair dealing. The Supreme Court has held that the ADA preemption clause does not "shelter airlines from suits alleging no violation of state-imposed obligations, but seeking recovery solely for the airline's alleged breach of its own, self-imposed undertakings." [96] "The ADA does not preempt 'state-law-based court adjudication of routine breach-of-contract claims' as long as there 'is no enlargement or enhancement based on state laws or policies external to the agreement.' " [97] AIB's claim of breach of the implied covenant of good faith and fair dealing is preempted because it seeks to add to the terms of FedEx's contractual obligations. The contract's termination clause states, "FedEx and Company agree that either party may terminate this Agreement at anytime upon thirty (30) days written notice to the other." [98] Even if it were possible to do so under New York law,[99] imposing a duty beyond the requirement of the termination clause would constitute an enlargement of FedEx's obligations based on state policies external to the agreement. Because the agreement concerns FedEx's prices, such an enlargement would interfere with the ADA's purpose of deregulating air carriers. The claim is therefore preempted.

### 4. Tortious Interference with Business Relations [100] and Contractual Relations [101]

 Both tortious interference claims are preempted. As recounted earlier, the complaint alleges that FedEx discontinued AIB's discounted shipping rate as well as the practice of allowing AIB's customers to create labels using AIB's account information.[102] The complaint further alleges that FedEx contacted AIB's customers directly to promote its competing service and offered them a lower ship-

---

**96.** *American Airlines, Inc. v. Wolens,* 513 U.S. 219, 228, 115 S.Ct. 817, 130 L.Ed.2d 715 (1995).

**97.** *Power Travel Int'l, Inc. v. American Airlines, Inc.,* 257 F.Supp.2d 701, 707 (S.D.N.Y. 2003) (quoting *Wolens,* 513 U.S. at 232–33, 115 S.Ct. 817).

**98.** Pricing Agr ¶ 8. Because the contract was referenced in the pleadings and attached thereto, the Court may consider it. *See Chambers,* 282 F.3d at 152.

**99.** *See ARI and Co., Inc. v. Regent Int'l Corp.,* 273 F.Supp.2d 518, 523 (S.D.N.Y.2003) ("New York law is clear that the implied covenant [of good faith and fair dealing] cannot be used to create independent obligations beyond the contract."); *Wolff v. Rare Medium, Inc.,* 210 F.Supp.2d 490, 497 (S.D.N.Y. 2002) ("The obligation of good faith does not create obligations that go beyond those intended and stated in the language of the contract.").

**100.** To establish a claim for tortious interference with business relations, a plaintiff must show: "(1) there is a business relationship between the plaintiff and a third party; (2) the defendant, knowing of that relationship, intentionally interferes with it; (3) the defendant acts with the sole purpose of harming the plaintiff, or, failing that level of malice, uses dishonest, unfair, or improper means; and (4) the relationship is injured." *Goldhirsh Group, Inc. v. Alpert,* 107 F.3d 105, 108–09 (2d Cir.1997).

**101.** To establish a claim for tortious interference with contract, a plaintiff must show: "(a) that a valid contract exists; (b) that a 'third party' had knowledge of the contract; (c) that the third party intentionally and improperly procured the breach of the contract; and (d) that the breach resulted in damage to the plaintiff." *Albert v. Loksen,* 239 F.3d 256, 274 (2d Cir.2001).

**102.** *See* Compl. ¶¶ 99, 102.

ping rate than what it charged AIB.[103] To the extent the theory underlying AIB's tortious interference claims concerns these allegations, the claims relate to FedEx's rates and services. If this Court were to find that such acts constitute tortious interference, both FedEx's prices and marketing strategies would be subject to regulation under state law, which would interfere with the ADA. Both tortious interference claims are therefore preempted.[104]

## V. LEAVE TO AMEND

When a claim is dismissed because of pleading deficiencies, the usual remedy is to permit a plaintiff to amend its complaint.[105] "Where it appears that granting leave to amend is unlikely to be productive, however, it is not an abuse of discretion to deny leave to amend. One appropriate basis for denying leave to amend is that the proposed amendment is futile." [106] Although AIB has not yet moved for leave to amend, I anticipate such a request and shall, therefore, offer a caveat.

With respect to the monopolization claim, it appears that AIB has alleged all it can regarding FedEx's willful acquisition or maintenance of monopoly power in a relevant market. Absent a showing by AIB that new facts have arisen to support this claim, granting leave to amend the monopolization claim would be futile. Similarly, absent a showing by AIB that it could plead new facts demonstrating a basis for its state law claims that is not related to FedEx's rates or services, granting leave to amend the state law claims would also be futile. Finally, AIB may amend its complaint with respect to its attempted monopolization claim, even though a properly pled claim alleging attempted monopolization of the facilitation market would be nearly identical to AIB's surviving leveraging claim and, if successful, would give rise to the same damages.[107]

## VI. CONCLUSION

For the foregoing reasons, FedEx's motion is granted in part and denied in part. AIB's monopolization and attempted monopolization claims are dismissed for failure to state a claim. The state law claims of misappropriation of trade secrets, unfair competition, breach of the implied covenant of good faith and fair dealing, and tortious interference with business relations and contractual relations are preempted by the ADA. FedEx's motion to dismiss AIB's monopoly leveraging claim is denied.

The Clerk of the Court is directed to close this motion (docket # 43). A confer-

---

103. *See id.* ¶¶ 103–04.

104. *See Virgin Atl.,* 872 F.Supp. at 66 (holding that the ADA preempts claims of interference with contractual relations and interference with prospective business relations alleging a variety of anticompetitive acts, which the court summarizes as "sharp practices"); *Travel All Over the World, Inc. v. Kingdom of Saudi Arabia,* 73 F.3d 1423 (7th Cir.1996) (holding that tortious interference claim is preempted to the extent that it relates to airline's refusal to transport passengers).

105. *See* Fed.R.Civ.P. 15(a) ("Leave [to amend] shall be freely given when justice so requires.").

106. *Lucente v. International Bus. Mach. Corp.,* 310 F.3d 243, 258 (2d Cir.2002) (quotation and citation omitted).

107. Although I have found that a monopoly leveraging claim will lie, AIB has not separately pled such a claim. If AIB seeks to amend its complaint, it should plead a separate claim covering this conduct.

ence is scheduled for November 15, 2004, at 3:30 p.m. in courtroom 15C.

SO ORDERED.